| | |
|---|---|
| JULIE DULL and ERIC O'DAY, individually and on behalf of the SunEdison Retirement Savings Plan, and all other similarly situated Plan participants and beneficiaries,<br><br>               Plaintiffs,<br><br>     vs.<br><br>SUNEDISON, INC. INVESTMENT COMMITTEE, SUNEDISON, INC., STATE STREET BANK & TRUST CO., JAMES B. WILLIAMS, RANDY H. ZWIRN, AHMAD R. CHATILA, EMMANUEL T. HERNANDEZ, ANTONIO R. ALVAREZ, PETER BLACKMORE, CLAYTON C. DALEY, JR., GEORGANNE C. PROCTOR, STEVEN V. TESORIERE, MATTHEW HERZBERG, and DOE DEFENDANTS 1–10,<br><br>               Defendants. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## NATURE OF THE ACTION

1.  Plaintiffs Julie Dull and Eric O'Day ("Plaintiffs"), individually, and on behalf of the SunEdison, Inc., Retirement Savings Plan (the "Plan"), and all other similarly-situated Plan participants and beneficiaries (the "Participants"), bring this action against the below-named defendants (collectively "Defendants") pursuant to §§ 404, 405, 409, and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1104, 1105, 1109 and 1132.

2.  Plaintiffs make the following allegations, except as to allegations pertaining to Plaintiffs (which are based on personal knowledge), based on their investigation and the investigation of their counsel, including a review of legal and regulatory filings, press releases, media reports about SunEdison, Inc. ("SunEdison" or the "Company"), public statements and filings issued by SunEdison, and a review of court filings in securities-fraud class actions pending

against the Company in the Eastern District of Missouri and derivative lawsuits brought on the Company's behalf in Delaware Chancery Court. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

3. This is a class action lawsuit under ERISA seeking recovery for damages caused to Plaintiffs and the Class due to the failure of the Defendants, fiduciaries of the Plan, to protect the interests of Plan Participants in violation of the Defendants' obligations under ERISA.

4. Defendants breached their fiduciary duties under ERISA by retaining SunEdison common stock (hereafter, "SunEdison Stock" or "Company Stock") as an investment option under the Plan, when a reasonable fiduciary using the care, skill, prudence, and diligence that a prudent man acting in a like capacity and familiar with such matters would have done otherwise.

5. Defendants permitted the Plan to continue to offer SunEdison Stock as an investment option to Plan Participants even after Defendants knew or should have known during the Class Period (from February 19, 2014 to the present) that: (a) SunEdison Stock was artificially inflated; (b) SunEdison was in extremely poor financial condition; and (c) the Company faced a liquidity crises and extremely deteriorating near and long-term prospects in the midst of attempting to completely transform the Company's business model, making the Company's stock an imprudent retirement investment for the Plan. Defendants were empowered, as fiduciaries, to remove SunEdison Stock from the Plan's investment options, yet they failed to do that, or to act in any way to protect the interests of the Plan or its Participants, in violation of their legal obligations under ERISA.

6. At least some of the defendants named herein have been sued in the past for violating their fiduciary duties under ERISA with respect to investment in company stock in the Plan. In 2008, when SunEdison's corporate name was MEMC Electronic Materials, Inc., some of

the Plan fiduciaries who are defendants in the present case, including Peter Blackmore and James B. Williams, were sued for allowing the Plan to invest in the Company's stock notwithstanding knowledge that such investment was no longer prudent. The case was eventually dismissed on March 24, 2014 by the Honorable Henry E. Autrey, based on defendants' arguments that they were entitled to a "presumption of prudence" (the so-called *Moench* presumption) under ERISA.

7. Just three months after Judge Autrey dismissed the prior ERISA class action, however, the United States Supreme Court unanimously decided *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014). In *Fifth Third Bancorp*, the Supreme Court eliminated the long-standing *Moench* presumption, which previously held that the offering of employer stock in an Employee Stock Ownership Plan (ESOP) is prudent and the burden to prove that it is not prudent shifts to the plaintiffs. The Supreme Court further held that ERISA "does not create a special presumption favoring ESOP fiduciaries." Rather, the same standard of prudence now applies to all ERISA fiduciaries, including ESOP fiduciaries.

8. In the present case, Defendants are thus not entitled to any presumption of prudence with respect to their decision to continue to invest Plan assets in SunEdison Stock. Here, Defendants continued to cause the Plan to invest in SunEdison Stock throughout the Class Period, despite the fact that Defendants knew or should have known at least by the beginning of the Class Period that investment in SunEdison stock was imprudent. SunEdison Stock was artificially inflated during the Class Period, while the Plan was purchasing SunEdison Stock. During the Class Period, the Company materially misrepresented the strength of its financial condition and prospects thereby inflating the value of its stock. As a result, SunEdison Stock, and correspondingly the Plan's assets invested in SunEdison Stock, lost substantial value once the truth emerged. Defendants were also aware of facts demonstrating SunEdison's perilous financial condition which demonstrated that investment in SunEdison stock was no longer a prudent investment for Class

3

members.

9.     On July 1, 2015, SunEdison liquidated its investment in SunEdison Semiconductor Ltd. ("SSL") in connection with an IPO of SSL's shares. SunEdison admitted at the time that "the disposal of our controlling interest in SSL completes a strategic shift that has a material effect on our operations and financial results."

10.     On August 6, 2015, SunEdison missed analyst consensus estimates and revealed larger than expected losses for the second quarter of 2015. On this news, shares of SunEdison declined $5.79 per share, over 25%, to close on August 6, 2015, at $17.08 per share, on heavy volume. Notwithstanding such material negative developments, the Defendants continued to allow Class Members to invest in SunEdison stock.

11.     On November 9, 2015, after the market closed, the Company reported third quarter earnings for 2015, revealing that it had a $284 million net loss, with $214 million in interest expenses for the quarter. On this news, shares of SunEdison declined $5.56 per share, over 38%, to close on November 10, 2015, at $5.77 per share, on heavy volume. Notwithstanding such material negative developments, the Defendants continued to allow Class Members to invest in SunEdison stock.

12.     On November 11, 2015, *Business Insider* published an article discussing the billions of dollars in cash commitments the Company was likely to face, as revealed in the Company's quarterly earnings report. On this news, shares of SunEdison declined $0.87 per share, over 15%, to close on November 11, 2015, at $4.90 per share, on heavy volume. Notwithstanding such material negative developments, the Defendants continued to allow Class Members to invest in SunEdison stock.

13.     On November 16, 2015, *Bloomberg* published an article on its website revealing that SunEdison had reclassified over $700 million worth of debt from "non-recourse" to "recourse,"

meaning the company's lenders would now have access to additional SunEdison collateral. The Company was reported to have about $12 billion of debt on its balance sheet, with some $3 billion of that amount listed as recourse to the Company.  On this news, shares of SunEdison declined $0.37 per share, over 7.5%, to close on November 16, 2015, at $4.56 per share, on heavy volume. Notwithstanding such material negative developments, the Defendants continued to allow Class Members to invest in SunEdison stock.

14.     Moreover, the same day (November 16, 2015), after the market closed, *Bloomberg* published an article revealing that the Company's second-largest shareholder (the hedge fund Greenlight Capital) had cut its stake in SunEdison by about 25%. News that additional hedge funds sold significant stakes in the Company was also disclosed. On this news, shares of SunEdison declined $1.54 per share, nearly 34%, to close on November 17, 2015, at $3.02 per share, on heavy volume.  Notwithstanding such material negative developments, the Defendants continued to allow Class Members to invest in SunEdison stock.

15.     On January 7, 2016, the Company announced a debt restructuring plan whereby SunEdison would issue $725 million of "Second Lien Secured Term Loans," and "entered into a series of exchange agreements with certain holders of its Convertible Senior Notes due 2018, 2020, 2022 and 2025 and its Perpetual Convertible Preferred Stock."  On this news, shares of SunEdison declined $2.17 per share, or nearly 40%, to close on January 7, 2016 at $3.34 per share.

16.     With respect to SunEdison Stock, as alleged below, Defendants failed to engage in a reasoned decision-making process, consistent with that of a prudent fiduciary acting in a like capacity, to review and properly evaluate Company Stock.  During the Class Period, Defendants failed to take any action with respect to the Plan's investment in SunEdison Stock, although that stock was clearly performing poorly and unduly risky throughout the Class Period.

17.     The market price of SunEdison Stock has fallen from approximately $15.76 on

February 19, 2014 (the beginning of the Class Period) to $2.43 on February 8, 2016 – a decline of over 84%.

**JURISDICTION AND VENUE**

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

19.     This Court has personal jurisdiction over all Defendants because they are all residents of the United States and ERISA provides for nation-wide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

20.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and one or more Defendants reside or may be found in this District.

**PARTIES**

**A.     Plaintiff**

21.     Plaintiff Julie Dull is a "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  During the Class Period, Plaintiff held shares of SunEdison Stock through her individual Plan account, and suffered losses as a result of investing her retirement Plan assets in SunEdison Stock.

22.     Plaintiff Eric O'Day is a "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  During the Class Period, Plaintiff held shares of SunEdison Stock through his individual Plan account, and suffered losses as a result of investing his retirement Plan assets in SunEdison Stock.

**B.     Defendants**

**(a)     Corporate Defendant**

23.     Defendant SunEdison is a Delaware corporation headquartered at 13736 Riverport

Drive, Maryland Heights, Missouri. SunEdison is the sponsor of the Plan.

24.     At all relevant times, SunEdison acted with respect to the Plan's assets through its officers and employees, and its Board of Directors ("Board"), who performed Plan-related fiduciary functions in the course and scope of their employment and/or affiliation with SunEdison. Upon information and belief, SunEdison has the authority to appoint and/or remove, through its Board and/or the Investment Committee (defined below), whose members are employed by SunEdison, the administrators, managers, and/or investment advisors, with respect to the Plan's assets. Upon information and belief, SunEdison is also responsible, through its Board and/or the Investment Committee, for reviewing the performance of any Plan fiduciary or other person(s) or entity(ies) to whom fiduciary duties have been delegated or allocated with respect to the Plan's assets. Accordingly, the actions of the individual Defendants named herein and other employee-fiduciaries are imputed to SunEdison under the doctrine of *respondeat superior*, and SunEdison is liable for these actions.

25.     During the Class Period, in addition to being a named fiduciary of the Plan, and in light of the foregoing duties, responsibilities, and actions, SunEdison possessed ultimate decision-making authority concerning whether to retain SunEdison Stock as an investment option. Accordingly, SunEdison was a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because it exercised discretionary authority and control over Plan management and control over disposition of Plan assets and/or authority to appoint and monitor Plan fiduciaries who had control over Plan management or control over management or disposition of the Plan's assets.

**(b)      The Director Defendants**

26.     Upon information and belief, the Director Defendants were responsible for appointing members of the SunEdison, Inc. Investment Committee (the "Investment Committee").

*See* 2014 Form 11-K at 4. As explained below, the Investment Committee was responsible for selecting the Plan's investment options. Because the Director Defendants had the authority to appoint the members of the Investment Committee, and the Investment Committee was responsible for managing the Plan's assets, the Director Defendants had the duty to monitor the activities of the Investment Committee. As a result, the Director Defendants had the ultimate responsibility for removing the Investment Committee members if necessary.

27. The Board is a juridical entity under ERISA and is named as a Defendant.

28. During the Class Period, each Director Defendant identified below was a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of the Plan's assets.

29. Defendant Clayton C. Daley, Jr. ("Daley") has served as a director of SunEdison since August 1, 2014.

30. Defendant Georganne C. Proctor ("Proctor") has served as a director of SunEdison since October 30, 2013.

31. Defendant Steven V. Tesoriere ("Tesoriere") has served as a director of SunEdison since 2012.

32. Defendant James B. Williams ("Williams") has served as a director of SunEdison since 2003.

33. Defendant Randy H. Zwirn ("Zwirn") has served as a director of SunEdison since 2013.

34. Defendant Ahmad R. Chatila ("Chatila") has served as President, Chief Executive Officer, and a director of SunEdison since March 2009.

35.     Defendant Emmanuel T. Hernandez ("Hernandez") has served as Chairman of the Board since January 2013, and as a director of SunEdison since 2009.

36.     Defendant Antonio R. Alvarez ("Alvarez") has served as a director of SunEdison since 2012.

37.     Defendant Peter Blackmore ("Blackmore") has served as a director of SunEdison since 2006.

38.     Defendants Chatila, Hernandez, Alvarez, Blackmore, Daley, Proctor, Tesoriere, Williams, and Zwirn, are collectively referred to herein as the "Director Defendants."

**(c)     Investment Committee Defendants**

39.     According to SunEdison's filings, the SunEdison, Inc. Investment Committee (defined above as the "Investment Committee") is the designated administrator of the Plan (the "Plan Administrator").  *See* 2014 Form 11-K at 4.  The Investment Committee signed the 2014 Form 11-K as the Plan Administrator. *Id*. at 13.

40.     Furthermore, as explained in the 2014 Form 11-K, the Investment Committee is charged with "the responsibility for reviewing the performance of the Plan's investment alternatives," including the SunEdison Stock Fund.  *Id*. at 4.  The Investment Committee members are further identified as the employees of SunEdison. *Id*.

41.     The Investment Committee is a juridical entity under ERISA and is named as a Defendant.

42.     Defendant Matthew Herzberg ("Herzberg") served as a member of the Investment Committee during the Class Period.  Defendant Herzberg signed the 2014 Form 11-K as a member of the Investment Committee.  *Id*. at 13.

43.     During the Class Period, each Investment Committee member, including, but not limited to Defendant Herzberg, was a fiduciary of the Plan within the meaning of ERISA Section

3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of the Plan's assets.

44.     Defendant Herzberg and other members of the Investment Committee, whose identities are presently unknown to Plaintiff, are collectively referred to herein as the "Investment Committee Defendants." Once the identities of the remainder of the Investment Committee members who served on the Investment Committee during the Class Period are ascertained through discovery proceedings, Plaintiffs will include them in any amended pleading(s) under their proper names.

**(d)     The Trustee Defendant**

45.     According to SunEdison's filings, Defendant State Street Bank & Trust Co. ("State Street") has served as the trustee of the Plan, effective January 2014. *See* 2014 Form 11- K at 5; *see also id*. at 11.  During the Class Period, State Street has held the Plan's assets in a trust established for the benefit of Plan Participants. *See id*. at 8 ("[t]he Plan assets are maintained in a trust fund").

46.     Defendant State Street maintains an office at 780 Third Avenue, New York, New York 10017.

47.     Given the overwhelming publicly available information during the Class Period signaling the deteriorating financial condition of SunEdison, State Street had a duty to disregard any instructions from the Investment Committee to invest the Plan's assets in SunEdison Stock. During the Class Period, State Street was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because State Street exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of the Plan's assets.

(e)     **Additional "John Doe Defendants"**

48.     To the extent that there are additional officers and employees of SunEdison who were fiduciaries of the Plan during the Class Period, including members of the Investment Committee, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 1-10 include other individuals, including, but not limited to, SunEdison officers and employees, who were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## THE PLAN

**A.      Purpose**

49.     The SunEdison Retirement Savings Plan (the "Plan") was established on April 1, 1989 under the provisions of Section 401(k) of the Internal Revenue Code and was restated January 1, 2012. The Plan is a defined contribution retirement savings plan, subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), sponsored by SunEdison, Inc. (the "Company" or the "Plan Sponsor"). The SunEdison, Inc. Investment Committee is the designated administrator of the Plan (the "Plan Administrator"), including having the responsibility for reviewing the performance of the Plan's investment alternatives. The members of the committee are employees of the Company. *See* Amendment No. 2 to the Company's Annual Report of the SunEdison Retirement Savings Plan on Form 11-K for the fiscal year ended December 31, 2013, filed on June 30, 2014.

50.     SunEdison used to be called MEMC Electronic Materials, Inc. On May 30, 2013, after stockholder approval at the Company's Annual Meeting of Stockholders, the Company changed its name from MEMC Electronic Materials, Inc. to SunEdison, Inc. As a result of the name change, the name of the Plan changed from "MEMC / SunEdison Retirement Savings Plan" to "SunEdison Retirement Savings Plan." Effective June 3, 2013, the Company's stock symbol on

11

the New York Stock Exchange changed from "WFR" to "SUNE" to reflect the new corporate name.

**B.      Administration of the Plan**

51.      According to the Plan's Annual Statement filed with the SEC on June 29, 2015: "The SunEdison, Inc. Investment Committee is the designated administrator of the Plan (the "Plan Administrator"), including having the responsibility for reviewing the performance of the Plan's investment alternatives.  The members of the SunEdison, Inc. Investment Committee are employees of the Company."  *See* SunEdison Form 11-K, filed June 29, 2015, at p. 4.  The Investment Committee, as Plan Administrator, is responsible for the day-to-day administration and operation of the Plan.

**C.      Contributions**

52.      During the Class Period, the Plan has provided for the following types of contributions: Employee salary deferrals; Employee matching contributions; Employer non-matching contributions; and Employer "rollover" contributions.

53.      "Participants may elect to contribute from 1% to 50% of their covered compensation as described in the Plan on a before-tax basis.  The before-tax contribution is limited to the amount specified by Section 402(g) of the Internal Revenue Code ($17,500 in 2013 and $17,000 in 2012). A participant is eligible to receive employer-matching contributions of 100% of the first 3% of the employee's contribution, 50% of the next 2% contributed, and 20% of the next 1% contributed, up to 4.2% of the participant's covered compensation for the Plan year. For the 2013 and 2012 plan year, the Company contributed 2% of compensation as a special employer contribution on behalf of all participants."  *See* Amendment No. 2 to the Company's Annual Report of the SunEdison Retirement Savings Plan on Form 11-K for the fiscal year ended December 31, 2013, filed on June 30, 2014, at p. 4.

**D.     Vesting**

54.     All Plan Participant accounts are immediately and fully vested.

**E.     SunEdison Stock Fund**

55.     During the Class Period, the Plan offered a number of investment options, including
the SunEdison Stock Fund.  *See* 2015 Form 11-K at pp. 4-5.  The SunEdison Stock Fund is
"typically comprised of approximately 97% SunEdison common stock and 3% cash." *Id*. at 5.  "In
May 2010, the Company limited the amount of future contributions to the SunEdison Stock Fund to
15% of a participant's total contributions.  In addition, participants are not allowed to transfer
existing balances into the SunEdison Stock Fund to the extent the amount invested would exceed
15% of the participant's account balance." *See* 2015 Form 11-K at p. 5.

56.     During the entire Class Period, the SunEdison Stock Fund was a highly material and
significant investment of the Plan.

57.     The following table presents investments that represent 5% or more of the Plan's net
assets available for benefits as of December 31, 2014 and 2013.

| | 2014 | | 2013 |
|---|---|---|---|
| Guaranteed Income Funds * | $ 21,602,299 | $ | 36,411,654 |
| Vanguard Institutional Index Fund | 19,032,864 | | 28,768,504 |
| SunEdison Stock Fund | 16,822,243 | | 18,214,054 |
| Thornburg International Value R5 Fund | 11,363,308 | | 16,411,333 |
| PIMCO Total Return Bond Fund | ** | | 14,664,288 |
| American Beacon Large Cap Value Institutional Fund | 11,783,867 | | 14,428,383 |
| Metropolitan West Total Return Bond I | 8,668,124 | | ** |
| JPMorgan Large Cap Growth Select | 7,415,731 | | ** |
| Goldman Sachs Small Cap Value Institutional Fund | 7,202,171 | | 12,194,623 |
| T. Rowe Price Capital Appreciation Fund | ** | | 12,002,166 |
| Eagle Small Cap Growth I Fund | 7,058,183 | | 11,680,675 |

**DEFENDANTS' FIDUCIARY BREACHES**

58.     During the Class Period Defendants knew or should have known that Company
Stock had become an imprudent Plan investment option for two independent reasons:

(a) SunEdison Stock was artificially inflated; and (b) the Company's basic risk profile had been so dramatically altered due to changed circumstances detailed below that it was no longer a prudent retirement investment for the Plan.

59.     From the start of the Class Period (February 19, 2014) until the present, the Plan's fiduciaries breached their fiduciary duties because they continued to permit the SunEdison Stock Fund to remain an investment option under the Plan and have failed to take any other action, consistent with ERISA and the federal securities laws, to prevent the Plan and its Participants from investing any more money in the imprudent SunEdison Stock Fund.

**A.     SunEdison Stock Was Artificially Inflated During the Class Period**

60.     SunEdison is a global renewable energy development company that develops, finances, installs, owns and operates renewable power plants to deliver electricity to its residential, commercial, government, and utility customers.  During the 2014 fiscal year, SunEdison was a developer and seller of photovoltaic energy solutions, an owner and operator of clean power generation assets, and engaged in the development, manufacture, and sale of silicon wafers to the semiconductor industry.

61.     A key part of SunEdison's business is use of the so-called yield companies ("YieldCos."), which have become common in the energy industry, particularly in the renewable energy sector, as a way to finance various types of clean energy production.  A YieldCo. is a dividend growth-oriented public company created by a parent company, such as SunEdison, that bundles long-term contracted operating assets to produce predictable cash flows.  The YieldCo. is taken public, and the proceeds are funneled to the parent to allow for further project development. The parent company, such as SunEdison, acquires assets such as power-generating plants, and then sells those assets and their customer contracts for power purchasing to the YieldCo.  The contracts then generate ongoing cash flows, meant to be distributed to the YieldCo.'s shareholders as

dividends.

62.     The Class Period begins on February 19, 2014, when the Company issued a press

release entitled, "SunEdison Reports Fourth Quarter and Full Year 2013 Results" which stated:

> St. Peters, MO, February 19, 2014 - SunEdison, Inc. (NYSE: SUNE)
> today announced financial results for the 2013 fourth quarter that
> reflected strong demand in its Solar Energy segment. Solar pipeline
> grew sequentially despite significantly higher project completions in
> the quarter. Lower revenue in the Semiconductor Materials segment
> was due to lower volumes and continued pricing pressures,
> influenced primarily by industry related weakness. We ended the year
> with cash and cash equivalents of $573.5 million and cash committed
> for construction projects of $258.0 million, totaling $831.5 million,
> resulting from the net cash inflows from term debt refinancing in
> connection with the convertible senior note offering, inflows from
> solar project financing and working capital management, partially
> offset by outflows from solar project construction.

> On February 18, 2014, SunEdison announced that it confidentially
> submitted a draft registration statement on Form S-1 to the United
> States Securities and Exchange Commission (SEC) relating to the
> proposed initial public offering of the common stock of a yield
> vehicle. The number of shares of common stock to be sold and the
> price range for the proposed offering have not yet been determined.
> The initial public offering is expected to commence after the SEC
> completes its review process, subject to market and other conditions.

> "Thanks to the hard work and dedication of our team, we achieved
> our target for solar project completions in the quarter. Our geographic
> breadth and early presence in regions now experiencing growing
> demand enabled another quarter of pipeline growth. The successful
> debt refinancing completed late last year and our proposed yield
> vehicle are important steps towards lowering our cost of capital," said
> Ahmad Chatila, Chief Executive Officer. "Despite challenging
> conditions in the semiconductor market, our Semiconductor Materials
> segment generated positive operating cash flow and continues to take
> action to lower its cost structure. According to industry forecasts, the
> semiconductor market is expected to grow in 2014, and we are
> positioned well from a customer, product and capability perspective
> to participate as the market improves. In 2014, we remain committed
> to strengthening our balance sheet and creating value for our
> stakeholders."

63.     On March 6, 2014 the Company filed its Annual Report with the SEC on Form

10- K for the 2013 fiscal year.  The Company's Form 10-K was signed by Defendant Chatila, and

reaffirmed the Company's statements previously announced on February 19, 2014. The Form 10-K

also contained required Sarbanes-Oxley certifications, signed by Defendant Chatila, who certified

that:

1.      I have reviewed this annual report on Form 10-K of SunEdison, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision; to ensure that material information relating to the registrant, including its consolidated subsidiaries is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.      The registrant's other certifying officers and I have disclosed, based on our

most recent evaluation of internal control over financial reporting, to the registrant's independent registered public accounting firm and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

64. During the Class Period, SunEdison spun off two separate corporate entities set up as YieldCos., to raise capital to fund the massive solar and wind power projects that are at the heart of the Company's business: TerraForm Global and TerraForm Power.

65. On May 29, 2014, SunEdison announced that TerraForm Power, Inc. ("TerraForm Power"), a YieldCo. subsidiary of SunEdison, had filed a registration statement with the SEC for a proposed initial public offering ("IPO"). SunEdison retained over 90% of the voting power in the company. According to SunEdison's filings, "our business model is to contribute or sell solar energy systems to our TerraForm Power segment, and to realize cash upon the completion and sale of a solar energy system." SunEdison's annual report on Form 10-K for the 2014 fiscal year.

66. Throughout the next year, SunEdison issued quarterly financial statements touting the prospects of its growth in the alternative energy market. At the same time, the Company also continued its acquisition strategy, announcing its acquisition of First Wind Holdings, LLC ("First Wind") for $2.4 billion in a transaction that was completed on January 29, 2015.

67. To fund its acquisitions, SunEdison raised $190 million through a secondary offering of shares in Singapore-based SunEdison Semiconductor Ltd., secured a $400 million credit commitment from several financial institutions, offered $350 million of convertible senior notes due 2022, and offered $375 million aggregate principal amount of convertible senior notes due 2023 and $375 million aggregate principal amount of convertible senior notes due 2025.

68.     On May 8, 2014, the Company issued a press release entitled, "SunEdison Reports

First Quarter 2014 Results," which reported:

> SunEdison, Inc. (NYSE: SUNE) today announced financial results
> for the 2014 first quarter which reflected continued progress in solar
> projects retained in its Solar Energy segment and sequentially
> improving volumes in its Semiconductor Materials segment. Solar
> pipeline grew sequentially, and gross additions were 323 MW.
>
> "During the 2014 first quarter, we continued our efforts to build and
> retain solar projects," said Ahmad Chatila, Chief Executive Officer.
> "We expect 2014 to be a strong year for solar project completions,
> based on our growing pipeline and our project construction plans
> over the next few quarters. The Semiconductor Materials segment
> grew units sequentially and our cost reduction and manufacturing
> efficiency programs are progressing well. We continue to believe that
> business segment remains well positioned for the long term."

69.     On August 7, 2014, SunEdison held a conference call with analysts and investors to

discuss the Company's second quarter 2014 financial results.  During the conference call, Mr.

Wuebbels of SunEdison reaffirmed to investors the benefits of SunEdison's YieldCo. strategy,

stating:

> Our job as the parent is to create a mountain of projects ahead of
> TerraForm to be able to maintain their growth and their dividend. So
> for me, it's about doing exactly what we do every day, which is
> originate high quality projects, underwrite high quality, high value
> projects, and position them for most value by retaining them in
> TerraForm…. Our underwriting criteria has changed not one bit with
> TerraForm. We haven't lowered the bar. We haven't looked to
> change our pricing dynamics, our economic dynamics one bit. We
> just see ourselves and TerraForm shareholders gaining that advantage
> in value through the long term ownership.

70.     On November 5, 2014, the Company issued a press release entitled, "SunEdison

Reports Third Quarter 2014 Results" in which, in relevant part, Defendant Chatila stated:

> SunEdison, Inc. (NYSE: SUNE) today announced financial results
> for the 2014 third quarter.
>
> "During the third quarter, we continued pursuit of the
> transformational strategy that the company has outlined. Our leading
> project development team continued its strong execution track record

18

by completing construction of 297 MW during the quarter while converting approximately 1.0 GW of future potential projects into backlog and adding 561 MW of gross pipeline during the quarter," said Ahmad Chatila, Chief Executive Officer. "We also successfully launched the TerraForm Power IPO in July. By taking advantage of the lower cost of capital of yieldcos[.], we believe we are able to create significant additional value for our shareholders."

71.     On November 5, 2014, the Company filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal third quarter. The Company's Form 10-Q was signed by Wuebbels and reaffirmed the Company's statements announced on November 5, 2014. The Form 10-Q also contained required Sarbanes-Oxley certifications, signed by Defendant Chatila, substantially similar to those contained *supra* in ¶63.

72.     On February 18, 2015, the Company issued a press release entitled, "SunEdison Reports Fourth Quarter And Full Year 2014 Results" which, in relevant part, stated:

> SunEdison, Inc. (NYSE: SUNE) today announced financial results for the 2014 fourth quarter.
>
> "During the fourth quarter, we continued our record of strong execution as we reached new quarterly and annual milestones by completing all-time highs of 383 MW during the quarter and 1,048 MW for the year while growing our pipeline to 5.1 GW and our backlog to 2.6 GW. In addition, we made the transformative announcement to acquire First Wind, a leading wind developer. The transaction, which has subsequently closed in the first quarter, has positioned SunEdison as the leading renewable power plant developer in the world and will further accelerate our growth and be additive to our fourth quarter pipeline," said Ahmad Chatila, Chief Executive Officer.
>
> Key summary financial results for the 2014 fourth quarter are set out in the following table. Financial results include consolidation of SunEdison Semiconductor Limited ("Semiconductor Materials") and TerraForm Power, Inc. ("TerraForm Power"). See the financial statement tables at the end of this press release for a reconciliation of all GAAP to non-GAAP financial measures.

| Financial Highlights: | 4Q'14 | 3Q'14 | 4Q'13 | Qtr/Qtr | Yr/Yr |
|---|---|---|---|---|---|
| **GAAP:** | | | | | |
| Net Sales | $610.5 [1] | $681.2 [3] | $551.2 | ($70.7) or (10.4)% | $59.3 or 10.8% |
| Gross Margin % | 13.3% [1] | 10.0% [3] | (2.6)% | 330 bps | 1590 bps |
| Operating Loss | (160.2) [1][2] | (189.8) [3][4] | (184.4) [6][7] | 29.6 | 24.2 |
| Net Loss | (242.1) [1][2] | (283.5) [3][4][5] | (286.4) [6][7][8] | 41.4 | 44.3 |
| EPS | (0.89) [1][2] | (1.06) [3][4][5] | (1.07) [6][7][8] | 0.17 | 0.18 |
| **Non-GAAP:** | | | | | |
| Net Sales | $625.5 | $540.5 | $960.7 | $85.0 or 15.7% | ($335.2) or (34.9)% |
| Gross Margin % | 10.8% | 15.2% | 4.9 % | (440) bps | 590 bps |
| Operating Loss | (173.8) [2] | (175.6) [4] | (123.5) [6][7] | 1.8 | (50.3) |
| Net Loss | (42.7) [2] | (181.8) [4][5] | (128.7) [6][7][8] | 139.1 | 86.0 |
| EPS | (0.16) [2] | (0.68) [4][5] | (0.48) [6][7][8] | 0.52 | 0.32 |
| **Cash Flow:** | | | | | |
| Capital Expenditures | $47.8 | $86.8 | $31.9 | ($39.0) | $15.9 |
| Cash Flow from Operations | (199.9) | (276.3) | (399.3) | 76.4 | 199.4 |
| Free Cash Flow | 198.6 | (569.7) | (25.0) | 768.3 | 223.6 |

Note: Table unaudited

(1) Includes $21.7 million, or EPS of $0.07, related to previously deferred GAAP revenue.

(2) Includes $34.2 million, or EPS of $(0.13), related to long-lived asset impairments.

(3) Includes $4.0 million, or EPS of $0.01, related to previously deferred GAAP revenue.

(4) Includes $100.4 million, or EPS of $(0.39), related to long-lived asset impairments.

(5) Includes $9.6 million, or EPS of $0.04, related to a gain on extinguishment of debt.

(6) Includes $37.0 million, or EPS of $(0.13), related to the Merano, Italy long-lived asset impairment.

(7) Includes $15.2 million, or EPS of $(0.06), related to impairment of intangible assets.

(8) Includes $75.1 million, or EPS of $(0.29), related to the loss on extinguishment of debt.

## Cash Flow

Operating cash used in the 2014 fourth quarter was $199.9 million and was primarily the result of changes in working capital and continued investment to grow the business.

Free cash flow was $198.6 million and was largely influenced by solar energy project financing, solar project construction activities, and capital expenditures. See the reconciliation of free cash flow in the financial statement tables at the end of this press release.

Capital expenditures were $47.8 million in the 2014 fourth quarter, of which $23.1 million was incurred in the Semiconductor Materials segment. The company also incurred $158.9 million to secure wind turbines expected to result in 1.6 GW of PTC-eligible wind projects. Furthermore, the company invested $304.3 million in acquisitions. The company ended the 2014 fourth quarter with cash and cash equivalents of $943.7 million and cash committed for construction projects of $130.7 million, for a total of $1,074.4 million.

## Earnings per Share

Fourth quarter 2014 GAAP earnings per share was $(0.89) and non-GAAP earnings per share was $(0.16).

## Segment Results

Key segment financial results for the 2014 fourth quarter are set out in the following table. Financial results include the consolidation of Semiconductor Materials and TerraForm Power. In anticipation of our Semiconductor Materials IPO we made certain changes in our internal financial reporting as of January 1, 2014, and these changes are reflected in our

reportable segments data disclosed in our consolidated financial statements. Additionally, as a result of the TerraForm Power IPO, we have identified TerraForm Power as a reportable segment and our results on a segment basis are reported accordingly. See the financial statement tables at the end of this press release for a reconciliation of all GAAP to non-GAAP financial measures.

*US$ Millions except for EPS*

| Segment Summary | 4Q '14 | 3Q '14 | 4Q '13 | Qtr/Qtr | Yr/Yr |
|---|---|---|---|---|---|
| **Net Sales:** | | | | | |
| Solar Energy GAAP | $382.6 [(1)] | $437.2 [(3)] | $361.9 | ($54.6)  or (12.5)% | $20.7  or 5.7% |
| Solar Energy Non-GAAP | 397.6 | 296.5 | 771.4 | 101.1   or 34.1% | (373.8) or (48.5)% |
| TerraForm Power | 42.6 | 53.2 | 4.5 | (10.6) or (19.9)% | 38.1  or 846.7% |
| Semiconductor Materials | 205.9 | 213.2 | 211.6 | (7.3) or (3.4)% | (5.7) or (2.7)% |
| Intersegment eliminations | (20.6) | (22.4) | (26.8) | 1.8  or (8.0)% | 6.2  or (23.1)% |
| **Operating (Loss) Income:** | | | | | |
| Solar Energy GAAP | ($132.7) [(1)(2)] | ($147.8) [(3)(4)] | ($153.6) [(6)] | $15.1 | $20.9 |
| Solar Energy Non-GAAP | (146.3) [(2)] | (133.6) [(4)] | (92.7) [(6)] | (12.7) | (53.6) |
| TerraForm Power | (23.8) | 20.5 | 0.5 | (44.3) | (24.3) |
| Semiconductor Materials | (3.7) | (62.5) [(5)] | (31.3) [(7)] | 58.8 | 27.6 |

Note: Table unaudited

(1) Includes $21.7 million, or EPS of $0.07, related to previously deferred GAAP revenue.

(2) Includes $32.8 million, or EPS of $(0.12), related to long-lived asset impairments.

(3) Includes $4.0 million, or EPS of $0.01, related to previously deferred GAAP revenue.

(4) Includes $42.4 million, or EPS of $(0.16), related to long-lived asset impairments.

(5) Includes $58.0 million, or EPS of $(0.23), related to long-lived asset impairments.

(6) Includes $15.2 million, or EPS of $(0.06), related to impairment of intangible assets.

(7) Includes $33.6 million, or EPS of $(0.13), related to the Merano, Italy long-lived asset impairment.

**Solar Energy: GAAP**

Solar Energy segment GAAP revenue was higher year-over-year primarily due to higher solar energy systems sales volumes and increased energy revenue from retaining more systems. Solar Energy segment GAAP revenue for the 2014 fourth quarter included $21.7 million of previously deferred solar project revenue. GAAP revenue was lower sequentially primarily due to lower project sales volume. In the 2014 fourth quarter, Solar Energy recognized GAAP revenue from solar projects totaling 61 MW, down from 95 MW in the 2014 third quarter but up from 55 MW in the 2013 fourth quarter. During the 2014 fourth quarter, 295 MW of additional projects were constructed and retained on the balance sheet.

Operating loss was lower year-over-year and sequentially. Losses continued primarily due to projects being retained rather than sold, non-cash asset impairment charges, and operating expenses related to growth initiatives.

**Solar Energy: Non-GAAP**

Solar Energy segment non-GAAP revenue was lower year-over-year, primarily due to lower project sales volume. Non-GAAP revenue was higher sequentially primarily due to higher project sales volume in the fourth quarter. Non-GAAP revenue resulted from 88 MW of solar projects sold in the 2014 fourth quarter, compared to non-GAAP revenue from 46 MW in the 2014 third quarter and 206 MW in the 2013 fourth quarter. Of the 88 MW of non-GAAP revenue in the 2014 fourth quarter, 73 MW were direct sales and 15 MW were sale-leaseback transactions.

Solar Energy segment non-GAAP operating loss increased year-over-year and sequentially. Operating loss was higher year-over-year and sequentially due primarily to non-cash asset impairment charges, higher operating expenses related to growth initiatives, and costs associated with retaining rather than selling completed projects.

**Solar Project Pipeline, Backlog & Construction**

*MW*

| Pipeline Summary | 4Q'14 | 3Q'14 | 4Q'13 | Qtr/Qtr | Yr/Yr |
|---|---|---|---|---|---|
| Pipeline [1] | 5,113 | 4,523 | 3,397 | 590  or 13% | 1,716  or 51% |
| Backlog [2] | 2,595 | 1,833 | 1,052 | 762  or 42% | 1,543  or 147% |
| Construction | 467 | 610 | 504 | (143)  or  (23)% | (37)  or  (7)% |
| Pipeline Additions [3] | 973 | 561 | | | |

Note: Table unaudited

(1) Includes Backlog and Construction

(2) Includes Construction

(3) Additions net of losses

A solar project is classified as "pipeline" where SunEdison has a signed or awarded PPA or other energy off-take agreement or has achieved each of the following three items: site control, an identified interconnection point with an estimate of the interconnection costs, and an executed energy off-take agreement or the determination that there is a reasonable likelihood that an energy off-take agreement will be signed. A solar project is classified as "backlog" if there is an associated executed PPA or other energy off-take agreement, such as a feed-in-tariff. There can be no assurance that all pipeline or backlog projects will convert to project sales revenue because in the ordinary course of our development business some fall-out is typical, certain projects will not be built and some projects will be retained on the balance sheet rather than sold. Of the projects under construction, we expect to retain a majority on the balance sheet. "Under construction" refers to projects within pipeline and backlog, in various stages of completion, which are not yet operational.

**TerraForm Power**
TerraForm Power revenue for the 2014 fourth quarter was higher year-over-year.  This was due primarily to higher energy and incentive revenue associated with operating projects acquired and projects which achieved commercial operations after the prior periods. TerraForm Power revenue was lower sequentially due to the seasonality of solar generation, partially offset by the impact of operating projects acquired and the impact of IPO portfolio additions. Compared to the third quarter, segment operating profit decreased primarily due to the seasonality of solar generation and acquisition expenses.

**Semiconductor Materials**
Semiconductor Materials revenue for the 2014 fourth quarter was lower year-over-year and sequentially, both as a result of lower selling prices.
Fourth quarter 2014 operating loss of $3.7 million improved substantially from the operating loss of $62.5 million for the 2014 third quarter and $31.3 million for the 2013 fourth quarter.

**Outlook**
The company looks forward to providing its 2015 first quarter and full year outlook, as well as detailed commentary regarding its strategy and 2015 business plan at its Capital Markets Day on February 24, 2015. A press release with further details regarding the Capital Markets Day has been issued separately.

**Use of Non-GAAP Measures**

Management has determined that certain non-GAAP metrics for the Solar Energy segment presented herein are important metrics that will help investors understand the ultimate income and near-term cash flows generated by our Solar Energy segment.  These non-GAAP measures and metrics include deferrals required under GAAP real estate and lease accounting for some of SunEdison's direct sales and or its sale-leaseback transactions as well as related tax impacts.  Management has also determined that the non-GAAP measure of "free cash flow" is useful to help investors better understand the capital intensity of our business, including our project financing operations.

73.     On May 7, 2015, the Company issued a press release entitled, "SunEdison Reports First Quarter Results." Therein, the Company, in relevant part, stated:

SunEdison, Inc. (NYSE: SUNE) today announced financial results for the 2015 first quarter.

"During the first quarter, the team continued our exceptional record of balancing operational execution while accomplishing our strategic initiatives. On the operations front, the team delivered 273 MW, a first quarter record, while also achieving new records in our pipeline, backlog, and projects under construction," said Ahmad Chatila, Chief Executive Officer. "Our asset ownership platform, TerraForm Power, increased its CAFD and dividend guidance as it reached 1.7 GW of operating assets. In addition, we closed the First Wind acquisition, while making significant progress on our strategic emerging market initiatives."

**Quarterly Review:**

- **All-Time MW Records for Q1**
  - 273 MW Total; up 123 MW Y/Y
  - 2.9 GW of backlog additions net of losses; 2.7 GW of gross pipeline additions; 774 MW under construction at quarter end

- **Execution on M&A; Successful Launch of Wind Platform**
  - Closed First Wind in January
  - Announced the Atlantic Power acquisition on April 1
  - Multiple announcements today supporting Emerging Markets initiatives

- **TerraForm Power Continues to Deliver**
  - $225 million 2015 CAFD guidance; up from $214 million
  - $1.35 dividend per share guidance for 2015; up from $1.30
  - 1,675 MW of operating assets as of quarter end; up 70% Q/Q
  - 167 MW of drop downs from SUNE in Q1

| Key Operating Metrics | 1Q 2015 Guidance | 1Q 2015 Actual |
|---|---|---|
| Annualized Unlevered CAFD for Retained MW ($M)[1] | 22-26 | 33 |
| Total MW | 220-250 | 273 |
|    Retained MW[1] | 145-160 | 202 |
|    3rd Party Sales MW[1] | 75-90 | 71 |

[1] Defined in Supplemental Definitions

Renewable Energy Development - Operating Metrics

| Pipeline Summary (MW) | 1Q'15 | 4Q'14 | 1Q'14 | Qtr/Qtr | Yr/Yr |
|---|---|---|---|---|---|
| Pipeline [1] | 7,519 | 5,113 | 3,575 | 2,406 or 47% | 3,944 or 110% |
| Backlog [2] | 5,201 | 2,595 | 984 | 2,606 or 100% | 4,217 or 429% |
| Construction | 774 | 467 | 463 | 307 or 66% | 311 or 67% |
| Pipeline Additions [3] | 2,679 | 973 | | | |

Note: Table unaudited

(1) Includes Backlog and Construction

(2) Includes Construction

(3) Additions net of losses

| 52.7 GW of Market Opportunities | | | | |
|---|---|---|---|---|
| GW | 34.9 | 10.3 | 2.3 | 5.2 |
| Stage | Leads | Qualified Leads | Pipeline Ex. Backlog | Backlog |
| Conversion % [1] | 10.0% | 40.0% | 60.0% | 90.0% |

[1]   The percentages noted above are the historic rates at which projects in each stage have converted to completed projects

Based on historical conversion rates, these combined leads, qualified leads, pipeline and backlog are forecasted to convert into 13.7 GW of completed projects.

| $8.3 Billion of Opportunity CAFD | | | | |
|---|---|---|---|---|
| $B Annualized Unlevered CAFD | 5.4 | 1.6 | 0.6 | 0.7 |
| Stage | Leads | Qualified Leads | Pipeline Ex. Backlog | Backlog |
| Conversion % [1] | 10.0% | 40.0% | 60.0% | 90.0% |

[1]The percentages noted above are the historic rates at which projects in each stage have converted to completed projects

Based on historical conversions, these combined leads, qualified leads, pipeline and backlog are forecasted to convert into $2.2B of CAFD from completed projects.

**Discontinued Operations**

As of March 31, 2015, we own 10,608,904 shares of SunEdison Semiconductor Limited ("SSL"), which represents a 25.6% ownership interest in SSL. The disposal of our controlling interest in SSL represents a strategic shift that has a major effect on our operations and financial results. As a result, our Semiconductor Materials segment is no longer considered a reportable segment and we have reported the historical results of operations and financial position of SSL as discontinued operations in the condensed consolidated financial statements for all periods presented.

**TerraForm Power**

TerraForm Power, Inc. (Nasdaq: TERP), a subsidiary of SunEdison,

increases its 2015 CAFD guidance from $214 million to $225 million, and raises its 2015 dividend per share guidance from $1.30 to $1.35. The first quarter dividend increased 20% to $1.30 per share on an annualized basis. Since December 31, 2014, TERP has grown its portfolio by 70% from 986 MW to 1,675 MW.
For the first quarter of 2015, TERP's quarterly distribution will be $0.325 per class A share. The cash distribution received by SunEdison on its class B units in TerraForm Power, LLC will be $16.9 million due to forbearance agreements on certain projects of approximately $3.4 million for the first quarter of 2015.

**B.      SunEdison Spins off a Second YieldCo.**

74.      On May 7, 2015, SunEdison announced that a second of its YieldCos., TerraForm Global, Inc. ("TerraForm Global"), had filed a registration statement in preparation for its IPO.

75.      The Company continued to take on new debt to fund growth. On June 16, 2015, SunEdison announced in a press release that it signed a definitive agreement to acquire 100 percent of Globeteq Mesoamerica Energy ("GME"), a renewable energy company based in Central America.  In the press release, Defendant Chatila touted the expansion of SunEdison, thereby encouraging investors, including the Plan Participants, to retain and buy SunEdison Stock on the perception that the Company was building a plan of sustainable growth:

> The acquisition of GME strengthens SunEdison's leadership position in the global wind energy market and significantly expands our presence in Central America, a region that offers growth opportunities for our emerging markets development platform. With this acquisition we not only gain an experienced and talented management team with a proven track record in the region, but also position ourselves to accelerate our performance and deliver attractive returns to our shareholders.

June 16, 2015 Press Release.

76.      However, unbeknownst to the investing public, including the Plan Participants, SunEdison's acquisition surge was built on nothing but a "house of cards," being propped up by misrepresentations and omissions.

77.      The statements contained in ¶¶62–77 were materially false and/or misleading when

made because Defendants knew but failed to disclose the following: (a) that the Company was facing severe liquidity needs after engaging in various costly acquisitions; (b) that the Company had unsustainable levels of debt, and that the amount of its debt classified as recourse or non-recourse was misleading; (c) that TerraForm Power and TerraForm Global were overpaying SunEdison for projects; (d) that the Company's yieldco. business model was unsustainable; and (e) that, as a result of the foregoing, the Company's statements about its business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

78.    Rather than address known needs to increase revenues and lower debt, the Company again embarked on another acquisition.  On July 20, 2015, SunEdison announced in a press release that it had entered into a merger agreement with Vivint Solar, a provider of residential solar systems in the United States, for $2.2 billion in cash, stock and convertible notes (the "Vivint Solar Acquisition").  Defendant Chatila stated in pertinent part as follows with regard to the Vivint Solar Acquisition:

> SunEdison's acquisition of Vivint Solar is a logical next step in the transformation of our platform after the successful execution of our First Wind acquisition in January 2015. We expect the Vivint Solar transaction to create significant value for our stockholders through the accretion in our TerraForm Power ownership, the acceleration of our Incentive Distribution Rights and an immediate expansion of our capacity and bandwidth to grow our residential business in the U.S. and globally. As of the fourth quarter of 2015, our organic growth and recent acquisitions will put SunEdison on track to deploy more than 1 gigawatt per quarter.

> *        *        *

> With Vivint Solar, we're tripling our value.

July 20, 2015 Press Release.

79.    However, unbeknownst to investors, including the Plan Participants, and despite Defendant Chatila's assurances, SunEdison's acquisition plan was unfeasible and an intentional effort to mask SunEdison's precarious financial condition.  By the time of the Vivint Solar

Acquisition, the Company was already highly leveraged and in financial distress as evidenced by its quarterly reports discussed below. As such, SunEdison needed TerraPower's liquidity and credit resources to help finance the Vivint Solar Acquisition. Consequently, SunEdison used its control over TerraForm Power (as alleged above, SunEdison retained over 90% of the voting power in TerraForm Power after its IPO) to compel TerraForm Power to purchase the assets that SunEdison was acquiring as part of its acquisition of Vivint Solar.

80. Indeed, one of largest shareholders of the TerraForm Power yieldco. recently sued Defendants Blackmore and SunEdison in Delaware Chancery Court, specifically alleging that SunEdison used its status as a controlling shareholder of TerraForm Power to force TerraForm Power to acquire such assets from SunEdison even though the asserts were fundamentally incompatible with its business model.[1] Specifically, TERP planned to purchase certain residential rooftop solar assets (the "Vivint Assets") that SunEdison was acquiring as part of SunEdison's $2.2 billion acquisition of Vivint Solar (the "July Vivint Transaction"). TERP's purchase price for the Vivint Assets was set at $922 million. Unlike the traditional utility-scale projects that TERP acquired from SunEdison, which involved credit-worthy counterparties and generated reliable cash flows, the Vivint Assets have individual homeowners as counterparties, reflecting significantly higher credit risk and lower reliability of cash generation.

81. The machinations of Defendants SunEdison and Blackmore with respect to the Vivint transaction demonstrate that Defendants were well aware of the imprudence of SunEdison stock at the time of the announcement of the transaction in July 2015 and indeed long before such announcement.

82. The Vivint Solar deal was criticized in the financial community as overpriced and too divergent from SunEdison's traditional utility-scale projects. Mackquarie Group stated in a

---

[1] *Appaloosa Investment Limited Partnership I, v. SunEdison, Inc., et al.*, Case No. 11898-CB (Del. Ch. Jan. 12, 2016).

July 21, 2015 analyst report that "[t]here is no denying that a ~60% premium paid for VSLR's [Vivint Solar] vs. its Friday close is gob smacking."

83.     The falling price of SunEdison Stock in the wake of the announcement of the Vivint Solar Acquisition, as well as the media reports criticizing this deal, were red flags that should have prompted the Defendants to investigate the continued prudence of retaining and purchasing further SunEdison Stock for the Plan. Yet, Defendants continued to maintain the SunEdison Stock Fund as a Plan investment to the detriment of Plan Participants. Following the announcement of the Vivint Solar Acquisition, SunEdison Stock remained on a downward trajectory, thereby eroding the value of the Plan Participants' retirement savings (while the stock was still inflated at the time by the undisclosed material information regarding the true condition of the Company).

84.     On July 31, 2015, TerraForm Global launched its IPO. Originally, TerraForm Global intended to raise a total of $1 billion. However, SunEdison was ultimately only able to raise $675 million through this IPO.

85.     Following the disappointing IPO of TerraForm Global, SunEdison Stock's price continued to plummet. However, Defendants persisted in misleading investors, including the Plan Participants, into believing that the Company's stock was still a prudent investment.

86.     By August 6, 2015, SunEdison Stock's price had dropped to $17.08 (the stock was trading over $31 prior to the announcement of the Vivint Solar Acquisition). That same day, SunEdison issued a press release announcing its financial results for the 2015 second quarter, reporting a loss of $263 million. The Company sustained a net loss of $.93 per share. SunEdison also reported that gross margins on the projects that the Company had sold to TerraForm Power were only 12.5%, a drastic cut from SunEdison's prior guidance of 18%. Furthermore, according to its financials, SunEdison's debt now stood at a whopping $11 billion, which included debt from a number of multi-billion dollar deals to acquire new wind and solar assets. Once again in the face

of increasing debt and other serious issues plaguing the Company, Defendant Chatila assured

investors, including the Plan Participants that:

> During the second quarter, we continued to balance operational
> execution while meeting our strategic objectives. On  the operations
> front, our leading organic development engine continues to execute
> as we exceeded our megawatt (MW) and Retained Cash Available for
> Distribution (CAFD) guidance, delivering 404 MW and $63 million,
> respectively. In addition, TerraForm Power delivered $65 million of
> CAFD and continues to create value for shareholders with its leading
> DPS growth. Finally, we have largely completed our platform
> transformation with the agreement to acquire Vivint Solar, a leader in
> residential solar, as well as the IPO of our Emerging Markets-focused
> asset ownership platform, TerraForm Global.

August 6, 2015 Press Release.

87.     Despite the falling price of SunEdison Stock and adverse Company-specific news

available in the public domain, such as the announcement of multi-million losses, the heavy debt

incurred by SunEdison, and criticism of the Company's prospects in light of the Vivint Solar

Acquisition, the Defendant-fiduciaries continued to take no action to protect the Plan Participants'

interests, and continued to offer the imprudent SunEdison Stock Fund as a Plan option.

88.     On October 1, 2015, analysts at CreditSights disclosed that a margin call on a $410

million SunEdison "non-recourse" margin loan that SunEdison carried may have been triggered,

which would wipe out a large portion of SunEdison's available cash.  That day SunEdison Stock's

price closed at $7.20.  Still, the Plan fiduciaries continued to do nothing to protect the Plan's assets

invested in SunEdison Stock.

89.     Furthermore, the Company continued to make misrepresentations concerning the

strength of its business, announcing layoffs of 15% of its workforce and restricting charges of $30

to $40 million for Q3 2015 through Q1 2016.  The October 5, 2015 Form 8-K reported that on

September 29, 2015, the Board approved the management's plan to reorganize.  However, the

October 5, 2015 Form 8-K misrepresented the purpose of these layoffs as a vehicle to "optimize

business operations in alignment with current and future market opportunities, and accelerate cash flow positive operations." In reality, the Company did not have the cash flow to sustain its operations.

90. The next day, on October 6, 2015, the *Wall Street Journal* reported in an article entitled "SunEdison Won't Complete $700 Million Buyout of Latin America Power" that as its "woes mount[ed]," SunEdison failed to make a required $400 million upfront payment for a roughly $700 million planned acquisition of Latin American Power ("LAP"). The article noted that attorneys for LAP stated that SunEdison was in breach of its obligations under the deal. That day, SunEdison Stock closed at $8.69.

91. The October 1, 2015 disclosure of the margin call on SunEdison's loan and the October 5, 2015 announcement of the Company layoffs, as well as the continually falling Company Stock price, were additional red flags that should have prompted the Defendants to investigate the continued prudence of retaining SunEdison Stock as a Plan investment. Yet, Defendants continued to maintain the SunEdison Stock Fund in the Plan.

92. Following the Company's October 5, 2015 announcement of massive lay-offs, SunEdison Stock price continued its downward spiral, thereby decimating the value of the Plan Participants' retirement savings.

93. On October 7, 2015, SunEdison disclosed that it was lowering its guidance for 2016, and announced in a press release that it would not sell any projects to TerraForm Power or TerraForm Global that year. In a Business Update presentation released to investors that same day, SunEdison described a "market dislocation" that had become apparent in the YieldCo. space, noting the recent extremely poor performance of both SunEdison's and Terra Form Power's respective stock prices. Defendant Chatila announced on a call with analysts that SunEdison would "pivot to third-party sales" because there was "a disconnect between the value of these underlying

assets and what people are willing to pay for them in a yieldco." Even worse, Defendant Chatila announced that SunEdison planned to reduce expansion plans in Latin America and other emerging markets, which were the YieldCo.'s geographic focus. Defendant Chatila explained that SunEdison "de-emphasized countries, consolidated divisions and walked away from things that didn't make sense in the current dislocation in the market." In other words, the project acquisition strategy upon which the YieldCos. depended to effectuate SunEdison's business plan would not be carried out.

94. On October 8, 2015, *SeekingAlpha* issued another article entitled "SunEdison: Is Bankruptcy Possible," noting that SunEdison's cash expenditures are "clearly unsustainable" with the Company burning "around $3.5 billion in the last four quarters." The article also noted that "SunEdison is over-leveraged" with "shareholders equity of only $632 million and total liabilities of $16,925 million, it is possible to calculate a debt to equity ratio of 26.78." According to another article in Tech Trader Daily, the results "severely call into question the health of the Vivint Solar organization (especially in the context of strong results from Sunrun and SolarCity)." The article reported that Credit Suisse's Patrick Jobin wrote that SunEdison investors should be concerned about what the Company is likely to be acquiring at this point:

> The decline in volumes and likely guidance miss, in addition to the weakening financial position (debt raises challenged recently), indicates troubles either organizationally or as a consequence of the pending acquisition by SunEdison which is supposed to close Q4-Q-1. While no shareholder vote has been scheduled to approve the merger, it appears financial underperformance is not a MAC to get out of the deal. While TerraForm is actively trying to sell the operating assets upon acquisition, one must as further questions about the strength of the development engine SunEdison is acquiring.

95. Similarly, Deutsche Bank's Visual Shah likewise cut his price target on SunEdison, noting that the Company's 10-Q included "language around SUNE debt financing" that "could concern some investors who are focused on the balance sheet, while opex needs could complicate

SUNE's ~$150M/Q Guidance."

96.     On October 22, 2015, Defendant Chatila informed Vivint Solar that SunEdison's Audit Committee of the Board had serious misgivings about the economics of the merger in light of the prevailing market conditions for both SunEdison and Vivint Solar.  SunEdison was in a severe liquidity crunch and was in danger of not being able to carry out the merger on the agreed upon terms.

97.     During the Class Period, as Defendants knew, SunEdison's financial condition had become dire.  In November 2015, SunEdison disclosed among other things: (a) drastically lower margins on retained projects than had been forecast; (b) significant funding issues with two separate transactions; (c) the re-categorization of over $700 million in "non-recourse" debt (including the $410 million margin loan) to "recourse," meaning the lenders could recover the amounts due directly from SunEdison; and (d) that it had taken out an emergency $170 million loan from Goldman Sachs on August 11, 2015, at a staggering effective interest rate of 15%.

98.     In response to this news, investors quickly abandoned the marketplace with several prominent hedge funds, such as Daniel Loeb's Third Point, selling their positions.  Yet, Defendants continued to maintain the SunEdison Stock Fund in the Plan to the detriment of the Plan Participants.  During the Class Period, Defendants took no action to protect the Plan and its Participants from, *inter alia*, not purchasing additional shares of artificially inflated Company Stock.

C.      **SunEdison Stock Has Been an Imprudent Investment During the Class Period**

99.     In addition to SunEdison stock being an imprudent investment due to the fact that its price was artificially inflated during the Class Period, it has also been imprudent due to material risks facing the Company during the Class Period.

100.    Throughout the beginning of the Class Period, Defendants were aware that

SunEdison's stock price was inflated and that its business model was undergoing a fundamental change (a "transformational strategy") that threatened its liquidity and financial prospects, and that SunEdison did not have sufficient resources to support its acquisition binge. Moreover, prior to the time it filed the IPO Registration Statement for TerraForm Global in 2015, Defendants knew that SunEdison would suffer a loss of $0.93 per share for its Q3 2015 quarter ending June 30, 2015, yet omitted this material information from the Registration Statement/Prospectus. The loss was much larger than expected and caused the market to call into question TerraForm Global's business plan and growth strategy, and thus that of its parent SunEdison. Defendants also knew that SunEdison would be unable to contribute significant operating assets to TerraForm Global in 2016. Defendants also knew that the Vivint transaction would create massive liquidity concerns at the Company.

101. Moreover, as discussed *supra*, prior to and during the Class Period, SunEdison incurred a gargantuan amount of debt to fund its operations. In particular, SunEdison's debt load reached $11.7 billion by the end of the third quarter of 2015. This debt has threatened the Company's liquidity and its solvency.

102. The liquidity risks facing SunEdison were widely reported during the Class Period and should have been well known to the Defendants, who nonetheless failed to act to protect the Plan Participants' investments in SunEdison Stock.

103. As alleged above, on August 6, 2015, SunEdison issued a press release, filed with the SEC as an exhibit to the Form 8-K, reporting results of its operations for the 2015 second quarter. The results were dismal and should have alerted Defendants (among other warning signs alleged herein that were already out in the public domain) of the need to investigate the prudence of maintaining the SunEdison Stock Fund as a Plan Investment. In particular, SunEdison reported a loss of $263 million in its second quarter. Additionally, SunEdison stated it had a loss of 93 cents

33

per share. SunEdison also reported that gross margins on the projects that the Company had sold to TerraForm Power were only 12.5% (down from SunEdison's prior guidance of 18%).

104. The market reacted very negatively to SunEdison's announcement of its 2015 second quarter earnings, with some analysts changing their recommendation to "Sell":

> NEW YORK (TheStreet) -- SunEdison (SUNE - Get Report) shares are down by 12.90% to $19.92 in early market trading on Thursday, following the release of the solar energy company's 2015 second quarter earnings results.
>
> The company reported a net loss of $263 million, or a loss of 93 cents per share on an adjusted basis on revenue that rose 5.6% to $455 million for the quarter.
>
> *          *          *
>
> Separately, *TheStreet* Ratings team rates SUNEDISON INC as a Sell with a ratings score of D+. *TheStreet* Ratings Team has this to say about their recommendation:
>
> ***"We rate SUNEDISON INC (SUNE) a SELL. This is driven by a number of negative factors, which we believe should have a greater impact than any strengths, and could make it more difficult for investors to achieve positive results compared to most of the stocks we cover. The company's weaknesses can be seen in multiple areas, such as its generally high debt management risk and weak operating cash flow."***

"SunEdison (SUNE) Stock Falling Following Earnings Results," *The Street*, Aug. 6, 2015 (emphasis added). SunEdison Stock closed at $17.08 on August 6, 2015.

105. On the same day that SunEdison released its Q2 2015 earnings, red flags were raised by the financial press that instead of building a successful renewable energy conglomerate (as SunEdison had been misrepresenting to investors, including the Plan Participants), the Company was actually building nothing more than a "house of cards":

> Debt could be too much for this renewable energy giant to overcome.
>
> In a quarter when its competitors wowed investors with better than expected profits, SunEdison (NYSE:SUNE) is plunging after another massive quarterly loss.

*The loss itself shouldn't surprise anyone who follows SunEdison, but it highlights how tough it's going to be to build a renewable energy powerhouse with nearly $11 billion in debt and negative cash flow from operations. The market is finally starting to realize that this high-profile renewable energy powerhouse may actually be building a house of cards.*

## Constructing a renewable energy giant

*What SunEdison has sold to investors over the past few years is that it can build a massive renewable energy company that can play in nearly every end market in every geography around the world.* The company has built an 8.1 GW pipeline of projects with 1.9 GW under construction on top of 404 MW finished in the second quarter. Those are impressive numbers no matter who is building them.

*But building that scale has been costly for SunEdison. The company has a $10.7 billion debt load and continual losses quarter after quarter.* Case in point was a loss of $263 million in the second quarter of 2015 on $455 million of revenue.

*There are a few alarming numbers in last quarter's report besides the loss.* First is that marketing and administration costs were $259 million, more than two and a half times the $103 million gross margin the company generated. On top of that, interest expense was $146 million, again more than gross margin.

*With losses mounting and debt piling up, the only way for SunEdison to get out from under the pressure is to build more projects even faster with even more debt.* It's the only path to potential profitability, but it's fraught with risk if interest rates rise or competitors with better technology begin winning projects. Given First Solar and SunPower's profitable results over the last two weeks, I think that second concern is bigger than SunEdison wants to admit.

## TerraForm Power paying money it doesn't have

*You could say that SunEdison is just pushing projects down to its yeildco, TerraForm Power* (NASDAQ:TERP), which will monetize projects long term. *That's true, and it has grown cash available for distribution (CAFD), but again, it's starting to look like a house of cards.*

TerraForm Power's CAFD for Q2 was reported to be $65 million, and it paid a dividend of $0.335 per share. But cash provided by operations was just $45.9 million, and net income was just $29.1 million. On top of that, the company has $2.3 billion of debt to pay

for with the cash flow.

At the very least, TerraForm Power is being aggressive about what it pays to shareholders and SunEdison, who owns all of its incentive distribution rights, and it is willing to leverage the balance sheet to do that.

**Beware buying the biggest in renewable energy**

*SunEdison likes to tout itself as the biggest company in renewable energy, but it's far from the most profitable, despite having one of the biggest debt loads in the industry.* That concerns me as an investor, and I don't see any sort of sustainable advantage for the company in renewable energy right now. SunEdison uses commodity solar panels, wind turbines manufactured by large conglomerates, and even battery storage that's a commodity.

*I'm not sure that's a path to success in renewable energy, and nearly $11 billion in debt is enough to scare me far away from this stock.*

"SunEdison's Losses Become a Red Flag for Investors," *The Motley Fool*, Aug. 6, 2015

(emphasis added).

106.    The massive Q2 2015 losses reported by SunEdison, the significant Company stock decline, as well as financial media reports that the Company's financial prospects were materially declining  because of, among other things, SunEdison's massive debt load and weak operating cash flow, should have prompted Defendants to investigate and take protective action with respect to the Plan's investment in SunEdison Stock.  Had a proper investigation been conducted, a prudent fiduciary would have determined that SunEdison Stock was no longer a prudent retirement investment for the Plan's Participants.  However, Defendants continued to offer the SunEdison Stock Fund as a Plan investment option, in derogation of their ERISA duties.

107.    On November 10, 2015, SunEdison issued a press release, filed with the SEC as an exhibit to the Form 8-K, reporting results of its operations for the third quarter ended September 30, 2015.  As was the case with respect to the Company's Q2 2015 results, these results were also dismal.  SunEdison incurred a loss of 92 cents per share from continuing operations for the third-

quarter 2015, much wider than the year-ago quarter loss of 77 cents. The Company's general and administration expenses increased about 135% to $296 million. Moreover, interest expenses doubled to $214 million because of higher debt. Therefore, SunEdison posted a loss from continuing operations of $287 million or 92 cents per share compared with a loss of $204 million or 77 cents posted in the third quarter of 2014.

108.    On the same day SunEdison released its third quarter 2015 results, *Reuters* reported that:

> Nov 10 (Reuters) - Shares of SunEdison Inc slid 24 percent to a nearly two-and-a-half-year low on Tuesday after the U.S. solar company posted a wider-than-expected loss, ***raising fresh concerns about its ability to fund its operations, projects and acquisitions***.
>
> The stock was down $1.49, or 20.1 percent, at $5.91 in midday trade on the New York Stock Exchange. The stock has lost 82 percent of its value since hitting a year high of $33.44 on July 20.
>
> The company also said it would stop selling projects to its two "yieldcos[.]" - bundles of solar, wind or other power assets it spun off into dividend-paying public entities.
>
> The "SunEdison shares slide 24 percent on liquidity fears," *Reuters*, Nov. 10, 2015 (emphasis added).

109.    The following day, on November 11, 2015, *Business Insider* reported that:

> Renewable-energy firm SunEdison is down 14% after the company disclosed a number of cash commitments in its quarterly earnings report.
>
> Here are the details:
>
> - According to an agreement SunEdison made in September, it has bought $100 million worth of TerraForm Global stock from one of its partners, Renova, in March 2016. TerraForm Global is down 4.2%.
> - It also may have to buy $4 billion worth of wind-farm projects from Renova.
> - Meanwhile, another SunEdison affiliate, TerraForm Power, could be required to buy 450 megawatts of

> completed Vivint projects in 2016, and up to 500 megawatts per year from 2017 to 2020 from SunEdison.
>
> • TerraForm Power is also obligated to pay $580.3 million of assets for some residential projects. TerraForm Power is down 4.3%.
>
> That's a lot of cash.
>
> SunEdison has been hurting some of Wall Street's biggest names since the stock price started falling this summer. The stock is down 75% year-to-date.
>
> David Einhorn of Greenlight Capital, and Leon Cooperman of Omega Advisors, have taken a hit. In August, Cooperman asked SunEdison executives if they would buy back some stock to stop the bleeding.
>
> He said: "Is there a massive change in the absolute relative prices of a number of your entities you're involved with? Does this create an opportunity for you creating additional value for shareholders by capitalizing on the short-term pessimism in midterm market or is that financial resource pretty much earmarked for reinvestment in the business?"
>
> In plain English, Cooperman was hoping that the company might embark on stock buybacks. The answer was "no" then, and given these disclosures regarding the company's hefty cash commitments, it's probably "no" now, too.

"SunEdison is getting obliterated," *Business Insider*, Nov. 11, 2015.

110.    In the meantime, despite the additional red flags raised by the third quarter 2015 results regarding the Company's business and prospects and the negative commentaries in the financial press, the Defendant-fiduciaries continued to offer the SunEdison Stock Fund as a Plan investment option and took no protective action with regard to the Plan's assets invested in SunEdison Stock.

111.    On November 19, 2015, following the release of SunEdison's financial results for the third quarter of 2015, *Real Money* reported that:

How did the former darling of the S&P 500 sink so low? It seems the company cannot catch a break, as *liquidity concerns have caught the attention [of] Wall Street analysts as well as hedge funds, who pared down their position in the company*. The Missouri-based renewable energy company develops, builds and operates solar and wind power plants. As part of its business, the company spun off two companies – TerraForm Global (GLBL) and TerraForm Power (TERP), both YieldCos[.] – to operate its projects. As of Wednesday's market close, its stock price has fallen 83% this year to $3.25 from $19.74.

*"The company overextended itself, continuing to make big acquisitions even when it became clear that the market had turned against them," Jim Cramer said of the company in August as the stock was already in freefall.*

Recent news hasn't been much better for SunEdison. *The company's disappointing third-quarter earnings, released on November 10, raised questions about its ability to meet current obligations.*

The reality is this: SunEdison's debt went from $2.6 billion to $11.7 billion currently," Gordon Johnson of Axiom Capital Management told *Real Money*. "A lot of that debt was due to the purchase of companies and projects they intended to drop down to the YieldCo. They can no longer do that so the question is can they sell that stuff into the open market at accretive margins?"

*The company's current ratio, which measures current assets vs. current liabilities, stands at 1.3, below the 1.5 to 2.0 range considered prudent by stock analysts.*

Axiom also takes issue with the company meeting its targets and how it measures – and discloses – its margins. In October, SunEdison said it planned to sell projects at 18% to 19% gross margin, but it reported that the projects were actually sold at 15%. Making matters worse, SunEdison said that the project excluded equipment, according to James Bardowski of Axiom.

"When you include the full solar system, they actually sold it at 9.6% gross margin – far below what they told everyone a month prior," Bardowski told *Real Money*.

*Also concerning analysts is a $160 million loan SunEdison received from Goldman Sachs.* Axiom as well as other analysts believe the loan was used to pay off another loan from Deutsche Bank. The company stated an interest rate on the loan of 9.25%, but paid a hefty origination fee, which made the effective rate closer to 15% -- a high

rate for short-term financing.

> ***"There's an absence of transparency in their financials,"*** said Doug Kass, of Seabreeze Partners Management and columnist for Real Money Pro. In reference to the company's sales figures as well as the Goldman Sacks loan.

> ***While fundamental issues about the company's sustainability persist, SunEdison has also taken several other hits this week. On Monday, as hedge funds submitted their 13Fs, it was revealed that several, including David Einhorn's Greenlight Capital and dan Loeb's Third Point, significantly pared down or completely exited their positions in SunEdison during the third quarter.*** Share of stock plummeted 33% on Tuesday, in response to the news.

> Adding to the pile, on Wednesday its shares were halted as the price shot up as high as 19% on a rumor that Blackstone was going to invest in SunEdison's debt. When those rumors proved to be untrue, the stock fell in after-hours trading.

"Will Troubled SunEdison Need to Raise More Equity?," *Real Money*, Nov. 19, 2015 (emphasis added).

112.    *Barron's* also echoed the analysts' concerns regarding SunEdison's liquidity, as well as analyst downgrades of SunEdison Stock:

> UBS dropped its price target to $3 a share from $6 on Wednesday. Analyst Julien Dumoulin-Smith explained:

> We value SUNE on a SOTP [sum of the parts] basis using a combination of EV/EBITDA and DCF [distributable cash flow' approaches plus the market value of LP ownership stakes in TERP and GLBL. We no longer assign any credit for GP incentive distribution rights (~$2/sh previously) and we now subtract the value of -$169M of expensive (9.25%) term loans taken out in August as disclosed in the most recent 10Q (another $0.50). We've decreased Vivint Solar (VSLR)'s cash balance from ~$150 mn to $82 mn per the earnings update. It remains unclear the new sale price for the VSLR assets to TERP via SUNE (who is responsible for pricing this sale, presumably driving further downgrade if unable to receive relief on VSLR terms).

> ***SUNE shares have been sliding this month following third quarter results that raised questions about its liquidity and ability to afford all its recent acquisitions. Reports that hedge funds were unloading their holdings in the third quarter and that management was not***

*providing answers to analysts' questions have made matters worse.*

"SunEdison Closes Below $3 A Share," *Barron's*, Nov. 19, 2015 (emphasis added).

113. All in all, SunEdison's shares plunged by 83% during the second half of 2015, as investors became increasingly concerned about the Company's ability to finance its plans, according to *Bloomberg*. In addition to the enormous decline of its stock price, the Company continued to experience other serious financial difficulties during the fall of 2015, including a dearth of liquidity, falling margins, and a reclassification of $739 million of its debt from "non-recourse" to "recourse." However, throughout this time, despite the red flags concerning, *inter alia*, the Company's extraordinary debt and its ability to survive, raised by both the Company's own quarterly reports, as well as the financial press covering the Company, the Plan's fiduciaries did nothing to protect the Plan Participants' interests invested in SunEdison Stock.

114. During the fall of 2015, as SunEdison continued to experience serious financial difficulties, including a sharp decline in its stock price, a dearth of liquidity, falling margins, and a reclassification of $739 million of its debt from "non-recourse" to "recourse," SunEdison and Vivint amended the merger agreement. In turn, SunEdison sought to impose an amended purchase agreement on TERP that retained the same unfair features.

115. The members of TerraForm Power's Conflicts Committee (as composed before November 20, 2015) reacted to the deterioration in SunEdison's financial condition and the generally negative market commentary on the deal by balking at the amended purchase agreement and exploring whether to invoke TERP's contractual right to terminate the transaction in light of SunEdison's amendment of the merger agreement.

116. The Conflicts Committee's desire to extricate TERP from the transaction posed a huge problem for SunEdison, which needed the Conflicts Committee's consent to proceed with the amendments to the July Vivint Transaction to which Vivint had already agreed in principle. Given

how bad the deal was for TERP, the Conflicts Committee was unwilling to give that consent, and certainly not on the rapid timetable SunEdison required.

117.    Faced with a Conflicts Committee that would not acquiesce to SunEdison's overreaching — and, indeed, was exploring how to correct its prior fiduciary failures by withholding its consent to the amendments and thereby extricating TERP from a bad transaction — on November 20, 2015, SunEdison replaced the TERP Conflicts Committee with new, handpicked directors it had appointed to the Board that same day.  SunEdison also replaced TERP's senior management team.

118.    These drastic actions demonstrate the Defendants' knowledge of SunEdison's precarious financial condition and knowledge that SunEdison stock was no longer a prudent investment.

119.    SunEdison's struggles have continued in 2016.  On January 7, 2016, SunEdison filed Form 8-K with the SEC, announcing pricing of $725 million of second lien secured term loans and entry into a series of exchange agreements, through which SunEdison swapped its debt for a mix of equity and new debt with a higher interest payment than the old debt did, resulting in $738 million debt restructuring.  However, SunEdison's desperate move to restructure its debt in an effort to stay afloat did not succeed in propping up the Company Stock price, which has already been declining for months during the preceding year (which went ignored by the Plan's fiduciaries).  The same date of the debt restructuring announcement, it was reported that:

> **Shares of the solar power semiconductor manufacturer are down over 40% following a series of complex moves that the company made to reduce debt.**
>
> First of all, SunEdison is offering a new $725 million second lien loan that will be used to pay about $170 million on a second lien credit. Included in this loan are 28.7 million shares worth of warrants.
>
> Also, $580 million worth of notes will be traded for a $225 million note due in 2018, plus 28 million common shares. Finally, 11.8

million common shares are being traded for $158.3 million in preferred stock.

> *This has triggered today's massive sell-off because how dilutive it is for investors*. Unfortunately, diluting the stock seems like a necessary evil for SunEdison, which desperately needs to reduce its debt. However, no one was expecting the costs to be this high.

"Why Is SunEdison Stock Crashing?," *Zacks Equity Research*, Jan. 7, 2016.

120.    Analysts' concerns about the Company's ability to survive were not allayed by SunEdison's January 7, 2016 announcement that it was restructuring its debt.  On the contrary, more alarms concerning, *inter alia*, SunEdison's massive debt, liquidity risks, and ability to raise more funds for project financing continued to sound in the financial press:

### Highlights of Debt Restructuring

SunEdison revealed that it is offering a $725 million second lien loan comprising of $500 million of A1 loans and $225 million of A2 loans. Both the loans, to mature on Jul 2, 2018, carry an interest rate of LIBOR+10%. The loan also includes 28.7 million shares worth of warrants.

This loan is part of its series of exchange agreements with certain holders of its Convertible Senior Notes due 2018, 2020, 2022 and 2025 and Perpetual Convertible Preferred Stock (the "2018 Notes," "2020 Notes," "2022 Notes," "2025 Notes," and "Preferred Stock," respectively).

The company intends to use part of the net proceeds to repay the existing $170 million second lien credit. The remaining will be utilized for the payment of interests, transaction costs and general corporate purposes.

Also, $580 million worth of notes will be traded for a $225 million note due in 2018, plus 28 million common shares. Finally, 11.8 million common shares will be traded for $158.3 million in preferred stock.

### What Triggered the Sell-off?

According to *Bloomberg*, though the aforementioned deals will increase SunEdison's net debt position by $42 million, it will add $555 million to liquidity — a very positive strategy for a cash-strapped company.

Then what made investors sell the stock? The high cost SunEdison is incurring to enhance liquidity.

Citing Sven Eenmaa, an analyst at Stifel Financial Corp., *Bloomberg* revealed that the new transaction will increase SunEdison's annual interest expenses by about $40 million. The financial data provider also stated that this will dilute existing shareholders by approximately 18%.

**Conclusion**

It is to be noted that SunEdison has been struggling to finance its projects due to the tremendous debt burden it incurred because of the string of buyouts, including First Wind and Solar Grid Storage, made over the past one year.

The situation worsened in July last year when SunEdison entered into a definitive agreement to acquire Vivint Solar Inc. VSLR in a cash-stock deal worth $2.2 billion. The deal made investors increasingly cautious about its rising debt pressure.

These acquisitions, once believed to be strategic, are now burning a hole in SunEdison's pocket. The acquisitions have taken a toll on its balance sheet with total outstanding debt (including current portion) nearly doubling to $11.7 billion at the end of third-quarter 2015 from $6.3 billion a year ago.

*Although SunEdison has taken a series of initiatives*, such as lowering its offer price for the Vivint Solar buyout and quitting the development projects in Brazil, to improve the liquidity position, ***we don't see any material impact on its balance sheet***.

***Further, we believe that with the recent sell-off, it will become difficult for SunEdison to raise more funds for project financing. Therefore, as the going gets tough for the company, we would advise investors to stay away from this Zacks Rank #3 (Hold) stock for now.***

"SunEdison Dives 39% on Complex Debt Restructuring Moves," *Zacks Equity Research*, Jan. 8, 2016 (emphasis added).

121.    Following SunEdison's January 7, 2016 debt restructuring announcement, it was widely reported in the financial press that the Company's financial prospects (and therefore the value of SunEdison Stock, and the corresponding value of the Plan's assets invested in this stock)

44

continue to look grim:

*A move to reduce debt may tell us more about how much trouble SunEdison Inc is in than anything else.*

On the surface, you wouldn't think a financial swap that reduces both long- and short-term debt would be a bad thing for a highly indebted company. But *for SunEdison Inc (NYSE:SUNE), the announcement that it was swapping debt for equity and a reduced amount of debt was met with scorn on Wall Street. …*

The problem for SunEdison is that it got so indebted that creditors started demanding higher and higher interest rates. At the same time, the company was forced to pivot strategies to selling projects to third parties, which is lower margin than holding them on the balance sheet. *The combination of higher borrowing costs and lower margins may be too much for SunEdison to overcome*.

### The thing with debt...

\*       \*       \*

The problems with debt start to show if returns don't exceed the cost of debt. And **with $11.7 billion in debt, $7.9 billion of which is at the parent company, the cost of debt is high for SunEdison**.

\*       \*       \*.

According to analyst Sven Eenmaa at Stifel Financial Corp., the exchange offer made on Thursday will actually increase interest expense annually by about $40 million because it exchanged low interest rate convertible debt for higher interest rate term debt. With this included, SunEdison's interest costs are about $276 million per year.

\*       \*       \*

Just breaking even will be a challenge based on the numbers above, but it's possible with an expected 3.5 GW installed in 2016. The real problems start to emerge when you start looking at its future cost of debt.

…the $725 million term loans announced yesterday came with interest rates of LIBOR + 10%, or about 10.85% as of today at 6-month LIBOR rates.

*That's an insanely high interest rate compared to competitors* like First Solar and SunPower, who are paying LIBOR plus 3.5% or less

on short-term debt. ***Not only does that mean interest costs may be increasing further in the future, it make it harder for SunEdison to build projects with competitive financing structures versus competitors.***

*     *     *

The general theme here is **that** ***SunEdison's business is moving toward the lower-margin business of selling projects to third parties at the same time its borrowing costs are trending higher. That's a slippery slope for any business, and it doesn't bode well for SunEdison, especially when it's competing against companies with much lower cost structures.***

As an investor, I'm staying far away from a high-risk company like SunEdison. It's possible the company survives all of these challenges, but ***the path it's currently on is unsustainable***, and I think there's a lot more dilution and/or restructuring to be done before it gets out from under its messy financial situation.

***The history of highly indebted companies in renewable energy isn't good, and the path forward for SunEdison doesn't look like a profitable one for investors.***

"SunEdison Inc's Digging a Hole It May Never Get Out Of," *The Motley Fool*, Jan. 9, 2016.

122. Indeed, since the market did not react positively to SunEdison's debt restructuring maneuver announced on January 7, 2016, the value of the Plan's assets invested in SunEdison Stock has continued to erode, reflecting the severe deterioration of SunEdison Stock's price:

…*24/7 Wall St.* has tracked five companies in which shareholders were destroyed last week.

*     *     *

***Investors pummeled SunEdison Inc. (NYSE: SUNE) after it restructured more of its debt this week, sending the share price down 46% at one point***. The restructuring deal extinguishes about $580 million in convertible debt and $158.3 million in preferred stock. The so-called Second Lien Secured Term Loans are expected to close on January 11, and SunEdison expects to receive $725 million in cash. After paying off approximately $170 million on its existing second lien credit facility, SunEdison will retain $555 million for, among other things, general corporate purposes.

The transactions will dress up the company's balance sheet, but the price is very high, according to one analyst cited by *Bloomberg*.

SunEdison's interest expense is likely to grow by $40 million a year and existing shareholders are being slapped with about 18% dilution to the value of their shares. Over the past week, the stock dropped roughly 30%. Shares of SunEdison closed at $3.41 late on Friday, with a consensus price target of $14.93 and a 52-week range of $2.55 to $33.45.

"5 Stocks That Destroyed Shareholders This Past Week," *24/7 Wall St.com*, Jan. 9, 2016 (emphasis added).

123.     On January 12, 2016, as SunEdison Stock continued on its downward slide, it was reported that:

> ***Gordon Johnson has doubts about Sunedison Inc (NYSE: SUNE)'s chances of making through the year.***
>
> Speaking Tuesday on PreMarket Prep, Johnson said he's concerned by the company's debt.
>
> "SunEdison amassed a massive amount of debt... The majority of that debt was used to buy projects they intended to drop down into their yieldco[.]," Johnson said, noting that Sunedison took on $10 billion in new debt from 2011-2015. "Essentially what happened is the yieldco story ended, and this was a company left with a lot of debt and a lot of projects which are extremely capital intensive. When the yieldco[.] story fell apart, you didn't have that buyer of first resort."
>
> The stock, which traded as high as $33.45 in July, was trading around $3 on Tuesday morning. The stock was briefly halted on a circuit breaker.
>
> The question now, according to Johnson, is whether Sunedison can sell these projects in the third-party merchant market. It's been trying since the second quarter of 2015, yet so far haven't been able to sell outside its own warehouses and yieldcos.
>
> This is the core of Johnson's worry: "Given the number of deals and the type of deals that they've done...if they're unable to sell those projects, ***I don't know how much longer the equity can last***."
>
> ***When asked if Sunedison's new financing deal was a good move, Johnson responded, "Absolutely not. I think this deal makes me more cautious on the company's ability to make it through 2016."*** …

"Axiom's Gordon Johnson 'More Cautious' On SunEdison's Ability To Make It Through 2016,"

*Benzinga.com*, Jan. 12, 2016 (emphasis added).

124. On January 12, 2016 alone, SunEdison Stock plummeted by 29% in mid-day trading, further undermining the Company's ability to survive:

> ***More concerns about high debt costs are hitting SunEdison and calling its future into question.***
>
> **What**: Shares of SunEdison Inc (NYSE:SUNE) fell as much as 29% mid-day on Wall Street Tuesday after another analyst questioned the company's long-term survival.
>
> **So what**: Analyst Gordon Johnson at Axiom Capital Management raised more concerns about the company's recent debt restructuring. Details of that restructuring can be seen here, but the short story is that SunEdison traded debt for a combination of equity and new debt that actually holds a higher interest payment than the old debt.
>
> What's concerning is that the restructuring came with debt that holds an interest rate in excess of 10%, incredibly high considering the fact that SunEdison bid aggressively to win projects on the idea that it had a low cost of capital. Johnson said on a podcast this morning, "***I don't know how much longer the equity can last***."
>
> **Now what**: ***SunEdison has been in a downward spiral and it's a situation that will be almost impossible to get out of at this point.*** The company needs low cost funding to build projects and needs new projects to pay for debt already on the balance sheet. With both working against the company there's not a likely scenario where it can get enough funding to dig out of its current hole. ***For investors, the risk of bankruptcy sometime in the next year is too big to ignore and I see no reason to buy the stock now***.

"Why SunEdison Inc's Shares Dropped Another 29% Today," *The Motley Fool*, Jan. 12, 2016 (emphasis added).

125. Also on January 12, 2016, one of TerraForm Power's largest shareholders, Appaloosa Investment Limited Partnership, filed a shareholder derivative action on behalf of TerraForm Power, Inc. and against Defendants Blackmore, SunEdison Inc. and others in Delaware Chancery Court — *Appaloosa Investment Limited Partnership I v. SunEdison Inc. et al.*, C.A. No. 11898-CB (the "TerraForm Power Derivative Action"). The Complaint alleges that Blackmore and

SunEdison damaged TerraFrom Power by causing it to purchase assets in connection with the SunEdison/Vivint deal, in which SunEdison allegedly compelled TerraForm Power to assume massive amounts of debt to purchase nearly $800 million of inferior residential rooftop solar energy assets from SunEdison that are fundamentally inconsistent with its business objectives and detrimental to its corporate interests.

126.    The TerraForm Power Derivative Action also alleges that Defendant Blackmore and others used SunEdison's status as a controlling shareholder of TerraForm Power ("TERP") to remove independent directors of the TerraForm Power Conflicts Committee and replace them with persons who are not independent and who are beholden to SunEdison.  SunEdison controls 91% of the voting power of TERP's stockholders and dominates the Company's Board of Directors.

127.    The TerraForm Power Derivative Action alleges that SunEdison used that control to force TERP to enter into the Vivint transaction for one reason, and one reason only:  to serve the parochial business interests of SunEdison, which, in light of its own dire financial condition, needs to plunder TERP's liquidity and financial resources in order to complete its own acquisition of Vivint Solar, Inc. ("Vivint") (from which TERP derives no benefit), raise liquidity, pay off a massive margin call and stave off bankruptcy.

128.    On July 20, 2015, SunEdison had announced that TERP would be acquiring assets from SunEdison that were fundamentally incompatible with its business model.  Specifically, TERP planned to purchase certain residential rooftop solar assets (the "Vivint Assets") that SunEdison was acquiring as part of SunEdison's $2.2 billion acquisition of Vivint Solar (the "July Vivint Transaction").  TERP's purchase price for the Vivint Assets was set at $922 million. Unlike the traditional utility-scale projects that TERP acquired from SunEdison, which involved credit-worthy counterparties and generated reliable cash flows, the Vivint Assets have individual homeowners as counterparties, reflecting significantly higher credit risk and lower reliability of

cash generation.

129.     The TerraForm Power Derivative Action also alleges the TERP portion of the Vivint

acquisition was designed by SunEdison not for the benefit of TERP but rather to provide

SunEdison with a much needed way to bankroll its acquisition of Vivint, whose large development

assets SunEdison desperately wants to acquire in order to further its own business interests.

Because SunEdison was (and still is) highly leveraged and in financial distress, it needed TERP's

liquidity and credit resources to help finance the Vivint acquisition.  Hence, it conceived and

implemented the tactic of using its control over TERP to compel TERP to strain its own financial

resources in order to purchase the residential Vivint Assets, thereby both giving SunEdison a

source of cash to acquire Vivint and at the same time enabling SunEdison to rid itself of the less

desirable residential assets it had to take as part of the deal with Vivint.

130.     SunEdison Stock hit a new 52-week trading low of $2.36 on January 12, 2016,

closing at $3.02. Summing up the serious issues plaguing the Company, one financial publication

reported as follows:

> …Separately, recently, *TheStreet Ratings* objectively rated this stock
> according to its "risk-adjusted" total return prospect over a 12-month
> investment horizon. . . . *TheStreet Ratings* has this to say about the
> recommendation:
>
> **We rate SUNEDISON INC as a Sell with a ratings score of D**. This
> is driven by a few notable weaknesses, which we believe should have
> a greater impact than any strengths, and could make it more difficult
> for investors to achieve positive results compared to most of the
> stocks we cover. **The company's weaknesses can be seen in multiple
> areas, such as its generally high debt management risk, generally
> disappointing historical performance in the stock itself and feeble
> growth in its earnings per share**.
>
> Highlights from the analysis by *TheStreet Ratings Team* goes as
> follows:
>
> - **The debt-to-equity ratio is very high at 8.33 and currently
>   higher than the industry average**, implying increased risk
>   associated with the management of debt levels within the

50

company. ***Along with the unfavorable debt-to-equity ratio, SUNE maintains a poor quick ratio of 0.76***, which illustrates the inability to avoid short-term cash problems.

- ***Looking at the price performance of SUNE's shares over the past 12 months, there is not much good news to report: the stock is down 82.14%, and it has underformed the S&P 500 Index*. *In addition, the company's earnings per share are lower today than the year-earlier quarter.*** Naturally, the overall market trend is bound to be a significant factor. However, in one sense, the stock's sharp decline last year is a positive for future investors, making it cheaper (in proportion to its earnings over the past year) than most other stocks in its industry. But due to other concerns, we feel the stock is still not a good buy right now.

- ***SUNEDISON INC's earnings per share declined by 19.5% in the most recent quarter compared to the same quarter a year ago. The company has reported a trend of declining earnings per share over the past two years … .***

"Here's Why SunEdison (SUNE) Stock Is Plummeting Today," *The Street*, Jan. 12, 2016 (emphasis added).

131.    Accordingly, during the Class Period, SunEdison Stock was not a prudent investment option for the Plan Participants, in light of, *inter alia*, (a) undisclosed material information regarding the Company's business and prospects that was inflating the value of SunEdison Stock; (b) poor historical performance of SunEdison Stock; (c) massive amounts of debt threatening the Company's ability to finance its projects and thereby the Company's survival; (d) the Company's rising debt-to-equity ratio; (e) the Company's likelihood of bankruptcy; (6) the Company's high debt management risk; and (f) the Company's losses as noted in SunEdison's quarterly reports.

132.    On January 26, 2016, one of SunEdison's largest shareholders — Greenlight Capital, Inc., owner of 5.87% of the Company's shares — entered into a letter agreement with SunEdison to (a) promptly appoint Claire Gogel to the Board of Directors of the Company (the "Board"), and to the Nominating and Corporate Governance Committee and the Finance and

Investment Committee of the Board; (b) adopt an amendment to the Company's Bylaws (the "Bylaw Amendment") promptly following the consummation of the Company's pending acquisition of Vivant Solar, Inc. and (c) until the Bylaw Amendment is adopted, to consult with certain personnel of Greenlight regarding issuances of equity securities, with certain exceptions.

133.    The Bylaw Amendment, the form of which is set forth in Exhibit A to the letter agreement, when adopted, will provide that, until the second anniversary of the Bylaw Amendment, the Company will not be permitted to engage in any issuance of shares of capital stock of the Company, or options, warrants, securities exercisable, convertible into or exchangeable for shares of capital stock of the Company, which issuance is first approved by the Board following the date of the Bylaws Amendment, without a supermajority vote of the Board (which is not obtained if two or more directors then in office, at least one of whom was not designated or nominated to the Board by Greenlight, its affiliates or its associates, or any person with whom Greenlight is deemed to be part of a group, vote against any such issuance).  The foregoing restriction will be subject to certain exceptions, including, but not limited to, issuances: (a) under the company's incentive equity plans, (b) resulting from the exercise, conversion or exchange of other securities and (c) pursuant to a shareholder rights plan.  Such Bylaw Amendment, after it is adopted, may only be altered or amended upon the affirmative vote of all directors then in office.

134.    On February 3, 2016, SunEdison stock fell 5% in intraday trading on concerns that SunEdison continued to struggle to close its proposed $1.9 billion acquisition of Vivint Solar (VSLR). As *TheStreet* reported on February 3, 2016 ("SunEdison (SUNE) Stock Down As Vivint Solar Deal Is Threatened," the acquisition was contingent on SunEdison's TerraForm Power (TERP) yieldco.'s immediate purchase of certain Vivint Solar assets after the deal closed. However, billionaire investor David Tepper's Appaloosa Management sued SunEdison in Delaware Chancery Court, with the hope of preventing the asset purchase by TerraForm Power.

*TheStreet* article noted that: "With the deal now in jeopardy, SunEdison might need to find another buyer of the Vivint portfolio or sell other assets to generate the $800 million that TerraForm Power was going to pay, Bloomberg reports."

135. On Saturday, February 6, 2016, *Motley Fool* published an article entitled "How SunEdison Inc's Woes Spilled Over to TerraForm Power Inc and Vivint Solar Inc in January," which stated:

> The SunEdison (NYSE:SUNE) family of companies, including yieldco[.] TerraForm Power (NASDAQ:TERP) and soon-to-be-acquired residential solar company Vivint Solar (NYSE:VSLR), had a rough January -- falling 38.5%, 21.4%, and 13.2%, respectively. ***In a year when solar installations should explode, these three are moving in the wrong direction.*** So what: Energy stocks had a rough month in general, which can be blamed for a small part of the problems in the solar industry. But SunEdison's financial difficulties are driving the decline in all three stocks.
>
> Vivint Solar is expected to be acquired in the next few months for a combination of cash and stock. ***But SunEdison doesn't have enough cash on hand to pay for the company, so it was planning to use TerraForm Power to finance the acquisition by buying Vivint Solar's operating assets for $799 million.*** The problem is that TerraForm shareholders, including billionaire David Tepper of Appaloosa Management, think buying residential solar assets is a bad idea, and they would rather the company focus on utility-scale projects with more reliable counterparties. Not to mention that TerraForm's current 14% dividend yield means it doesn't have the ability to sell shares to acquire assets in an accretive manner.
>
> So, SunEdison is seeking alternatives to close the acquisition, including potentially selling assets it has on the balance sheet or selling Vivint Solar assets to a third party. Both moves would likely result in transactions at fire-sale prices considering the decline in yieldcos[.] over the past six months, meaning SunEdison might be trading good assets for bad.
>
> If TerraForm can't throw in $799 million for the acquisition as planned, SunEdison may be out of room to offer debt as well. An exchange of debt for a combination of shares and new debt came with an interest rate of LIBOR + 10% with an 11% interest-rate floor. That's an absolutely insane price given that the cash-on-cash yields SunEdison has been paying for assets are around 9%.

Adding another twist, Greenlight Capital, which is a major shareholder, was offered a board seat, and the company agreed not to sell new shares that dilute current shareholders without a supermajority vote from the board of directors. So, selling shares to finance some of these moves is probably out of the question.

Now what: There aren't a lot of options for SunEdison at this point, and while the Vivint Solar acquisition will probably be completed, it could come at a steep price. SunEdison will likely have to sell assets, and if Tepper is successful in getting TerraForm Power to act more independently, he could reduce the value the yieldco[.] has for SunEdison.

**I would stay far, far away from these stocks** as billionaires fight over their future. There's simply too much risk to be involved in SunEdison or any of its related companies right now.

136.    On February 8, 2016, SunEdison stock declined another 8% on continued concern about SunEdison's financial condition and continued concern that SunEdison's Vivint transaction was in jeopardy.  The stock closed at $2.47, down 8% for the day.

**PROTECTIVE ACTIONS DEFENDANTS COULD HAVE TAKEN REGARDING THE PLAN'S ASSETS INVESTED IN SUNEDISON STOCK DURING THE CLASS PERIOD**

137.    The Class Period begins on February 19, 2014 because by then, Defendants should have been aware that investment in SunEdison Stock was no longer prudent for the Plan.

138.    Rather than do nothing (as they did), Defendants could have taken numerous steps with regard to the Plan's assets invested in SunEdison Stock to fulfill their fiduciary duties to the Plan under ERISA.  As set forth more fully below, none of these steps (a) would have violated securities laws or any other laws, or (b) would not have been more likely to harm the SunEdison Stock Fund than to help it.

139.    Defendants could have timely and fully disclosed the adverse inside information concerning the Company's business and prospects, subsequent to which, they could have disposed of the Plan's investments held in the SunEdison Stock Fund. Disclosure would have prevented the Plan from acquiring additional shares of artificially inflated SunEdison Stock.  The longer the

concealment continued, the more of the Class' retirement money went into an imprudent investment; full and timely disclosure would have cut short the period in which the Plan bought SunEdison Stock at inflated prices and allowed the Class' money to instead be invested in conservative investments earning a market return.

140.    Defendants could have also directed that all Company and Plan Participant contributions to the SunEdison Stock Fund be held by the Fund in cash rather than be used to purchase further SunEdison Stock.  Ceasing company stock purchases does not implicate insider trading prohibitions and would not have required any independent disclosures.

141.    Defendants also should have closed the SunEdison Stock Fund itself to further contributions, and directed that contributions be diverted from SunEdison Stock Fund into other investment options available under the Plan during the Class Period.

142.    Neither of these actions would have implicated, let alone been in violation of, federal securities laws or any other laws.

143.    Further, Defendants also could have:

- •    sought guidance from the DOL or SEC as to what they should have done;

- •    resigned as Plan fiduciaries to the extent they could not act loyally and prudently; and/or

- •    retained outside experts to serve either as advisors or as independent fiduciaries specifically for the SunEdison Stock Fund.

## THE RELEVANT LAW: CLAIMS FOR RELIEF UNDER ERISA

144.    ERISA requires that every plan name one or more fiduciaries who have "authority to control and manage the operation and administration of the plan."  ERISA § 1102(a)(1). Additionally, under ERISA, any person or entity, other than the named fiduciary that in fact performs fiduciary functions for the Plan is also considered a fiduciary of the Plan.  A person or

entity is considered a Plan fiduciary to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

145. At all relevant times, Defendants are/were and acted as fiduciaries within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

146. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

147. ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

148. ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

149. These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the

duties of loyalty, exclusive purpose and prudence and are the highest known to the law and entail, among other things:

(a) the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

(b) the duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

(c) the duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

150. Accordingly, if the fiduciaries of a plan know, or if an adequate investigation would reveal, that an investment option is no longer a prudent investment for that plan, then the fiduciaries must disregard any plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other, suitable, prudent investments.

151. ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

152.     Plaintiffs therefore brings this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## CLASS ACTION ALLEGATIONS

153.     Plaintiffs bring this action derivatively on the Plan's behalf pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, and as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plan, Plaintiffs, and the following class (the "Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the SunEdison Retirement Savings Plan at any time between February 19, 2014, and the present (the "Class Period") and whose Plan accounts included investments in SunEdison Stock.

154.     Given ERISA's distinctive representative capacity and remedial provisions, courts have observed that ERISA litigation of this nature presents a paradigmatic example of a FED. R. CIV. P. 23(b)(1) class action.

155.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of employees of SunEdison who participated in, or were beneficiaries of, the Plan during the Class Period whose Plan accounts included SunEdison Stock. For example, at the end of Plan year 2014, there were 2,153 participants in the Plan.  *See* 2014 Plan Form 5500 filed with the Department of Treasury Internal Revenue Service and the Department of Labor.

156.     At least one common question of law or fact exists as to Plaintiffs and all members of the Class. Indeed, multiple questions of law and fact common to the Class exist, including, but

not limited to:

(a)     whether Defendants each owed a fiduciary duty to the Plan, Plaintiffs, and members of the Class;

(b)     whether Defendants breached their fiduciary duties to the Plan, Plaintiffs, and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries; whether Defendants violated ERISA; and

(c)     whether the Plan, Plaintiffs, and members of the Class have sustained damages and, if so, what is the proper measure of damages.

157.    Plaintiffs' claims are typical of the claims of the members of the Class because the Plan, Plaintiffs, and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of ERISA as complained of herein.

158.    Plaintiffs will fairly and adequately protect the interests of the Plan and members of the Class because they have no interests antagonistic to or in conflict with those of the Plan or the Class.  In addition, Plaintiffs have retained counsel competent and experienced in class action litigation, complex litigation, and ERISA litigation.

159.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the action, or substantially impair or impede their ability to protect their interests.

160.    Class action status is also warranted under the other subsections of Rule 23(b)(1)(A) and (b)(2) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate

final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

**COUNT I**
**FAILURE TO PRUDENTLY MANAGE THE PLAN'S ASSETS (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404(a)(1)(B) AND 405 BY THE COMPANY DEFENDANT AND INVESTMENT COMMITTEE DEFENDANTS)**

161.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

162.    This Count alleges fiduciary breaches against the Company Defendant and Investment Committee Defendants (the "Prudence Defendants") for continuing to allow the investment of the Plan's assets in SunEdison Stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because:  (a) SunEdison Stock was artificially inflated during the Class Period; and (b) the Company's basic risk profile had been so dramatically altered due to changed circumstances that it was no longer a prudent retirement investment.

163.    At all relevant times, as alleged above, the Prudence Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan and/or disposition of the Plan's assets.

164.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that all investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  The Prudence Defendants were responsible for ensuring that all investments in Company Stock in the Plan were prudent.  The Prudence Defendants are liable for losses incurred as a result of such investments being imprudent.

165. Upon information and belief, Defendants failed to engage in a reasoned decision-making process regarding the prudence of SunEdison Stock. An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in SunEdison Stock was clearly imprudent during the Class Period. A prudent fiduciary acting under similar circumstances would have acted to protect Plan Participants against unnecessary losses, and would have made different investment decisions.

166. The Prudence Defendants breached their duties to prudently manage the Plan's assets invested in SunEdison Stock. During the Class Period, the Prudence Defendants knew or should have known that, as described herein, SunEdison Stock was not a suitable and appropriate investment for the Plan. Yet, during the Class Period, despite their knowledge of the imprudence of the investment, the Prudence Defendants failed to take any meaningful steps to protect Plan Participants from losses stemming from the Plan's investment in SunEdison Stock.

167. The Prudence Defendants further breached their duty of prudence by failing to divest the Plan of Company Stock during the Class Period, and/or by ceasing additional purchases of Company Stock, when they knew or should have known that it was not a suitable and appropriate investment for the Plan.

168. The Prudence Defendants also breached their duty of prudence by failing to provide complete and accurate information regarding SunEdison's true financial condition and, generally, by conveying inaccurate information regarding the Company's future outlook. During the Class Period, upon information and belief, Defendants fostered a positive attitude toward Company Stock, and/or allowed Plan Participants to follow their natural bias towards investment in the equities of their employer, by not disclosing negative material information concerning the imprudence of investment in Company Stock. As such, Plan Participants could not appreciate the true risks presented by investments in Company Stock, and therefore could not make informed

decisions regarding their investments in the Plan.

169.    As a result of Defendants' knowledge of and, at times, implication in, creating and maintaining public misconceptions concerning the true financial health of SunEdison, any generalized warnings of market and diversification risks that Defendants made to the Plan Participants regarding the Plan's investment in SunEdison Stock did not effectively inform the Plan Participants of the past, immediate, and future dangers of investing in Company Stock.

170.    The Prudence Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plan from inevitable losses.  The Prudence Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy them.

171.    As a direct and proximate result of the breaches of fiduciary duties during the Class Period alleged herein, the Plan and, indirectly, the Plan Participants lost a significant portion of their retirement investments. Had the Prudence Defendants taken appropriate steps to comply with their fiduciary obligations during the Class Period, the Plan could have liquidated some or all of its holdings in Company Stock, and/or not have purchased additional imprudent SunEdison Stock, and thereby eliminated, or at least reduced, the losses to Plan Participants.

172.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II
## BREACH OF DUTY OF LOYALTY (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404(a)(1)(A) AND 405 BY THE COMPANY, DIRECTOR DEFENDANTS, AND INVESTMENT COMMITTEE DEFENDANTS)

173.    Plaintiffs incorporate each and every preceding  allegation as if fully set forth herein.

174.    This Count alleges fiduciary breaches against the Company Defendant, Director Defendants and Investment Committee Defendants (the "Loyalty Defendants") for continuing to

allow the investment of the Plan's assets in SunEdison Stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because: (a) SunEdison Stock was artificially inflated during the Class Period; and (b) the Company's basic risk profile had been so dramatically altered due to changed circumstances that it was no longer a prudent retirement investment.

175. At all relevant times, as alleged above, the Loyalty Defendants were fiduciaries of the Plan within meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

176. ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty; that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

177. The duty of loyalty includes the duty to speak truthfully to the plan and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.

178. During the Class Period, the Loyalty Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in Company Stock; and by otherwise placing their own and/or the Company's interests above the interests of the Plan Participants with respect to the Plan's investment in the Company's securities.

179. During the Class Period, upon information and belief, certain Defendants, including the Director Defendants, made direct and indirect communications with the Plan Participants in which they omitted or misrepresented information regarding or materially related to investments in

Company Stock. These communications included, but were not limited to, SEC filings, townhall meetings with Company employees, including the Plan Participants, press releases, and Plan documents (including Summary Plan Descriptions). Defendants, including the Director Defendants, also acted as fiduciaries to the extent of this communication activity.

180. Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan Participants, well-recognized in the 401(k) literature and the trade press concerning employees' natural bias toward investing in company stock, including that:

(a) Out of loyalty, employees tend to invest in company stock;

(b) Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(c) Employees tend not to change their investment option allocations in the plan once made; and

(d) Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk;

181. Knowing of these natural biases toward investment of Company Stock, Defendants should have been on high alert to protect the interests of the Plan Participants. Defendants, however, disregarded their duties of loyalty to the benefit of the Company as demonstrated by the Plan's substantial investment of its assets in Company Stock, which goes against the grain of best investment practices.

182. Because at least some of the Defendants were compensated in SunEdison Stock and owned SunEdison Stock, these Defendants had a conflict of interest which put them in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan Participants, whose interests Defendants were obligated to loyally serve with an "eye

single" to the Plan. These Defendants, while attempting to shore up SunEdison during the Class Period, as its stock price plummeted, abandoned their duties to the Plan and its Participants, and failed to consider at any time during the Class Period what was in the best interest of the Plan and its Participants as they should have done as Plan fiduciaries.

183. The Loyalty Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plan from inevitable losses. The Loyalty Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy them.

184. As a consequence of the Loyalty Defendants' breaches of fiduciary duty during the Class Period by putting the interests of themselves and the Company ahead of the Plan and its participants, the Plan suffered substantial losses, as its holdings of Company Stock were devastated. If the Loyalty Defendants had discharged their fiduciary duties to loyally manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and, indirectly, Plaintiffs and the Plan's other participants, lost a significant portion of their retirement investments.

185. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III
## FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES AND PROVIDE THEM WITH ACCURATE INFORMATION (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 BY THE COMPANY, THE DIRECTOR DEFENDANTS AND THE INVESTMENT COMMITTEE DEFENDANTS )

186. Plaintiffs incorporate each and every preceding allegation as if fully set forth herein.

187. This Count alleges fiduciary breaches against the Company, the Director

Defendants, and the Investment Committee Defendants (the "Monitoring Defendants").

188. At all relevant times, as alleged above, the Monitoring Defendants were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

189. As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of other Plan fiduciaries.

190. Under ERISA, a monitoring fiduciary must ensure that monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of a plan's assets, and must take prompt and effective action to protect the plan and participants when they are not.

191. The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to the plan's participants or for deciding whether to retain or remove them.

192. Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan's assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

193. During the Class Period, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a) failing, at least with respect to the Plan's investment in Company Stock, to properly monitor their appointee(s), to properly evaluate their performance, or to have any proper system in place for doing so, and standing idly by as the Plan suffered significant losses as a result of the appointees' imprudent actions and inaction with respect to Company Stock;

(b) failing to ensure that the monitored fiduciaries appreciated the true extent of the Company's precarious financial situation and the likely impact that financial failure would have on the value of the Plan's investment in Company Stock;

(c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets and, in particular, the Plan's investment in Company Stock; and failing to remove appointees whose performance was inadequate in that they continued to permit the Plan to make and maintain investments in the Company Stock despite the practices that rendered it an imprudent investment during the Class Period.

194. As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses. If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided.

195. The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by those Defendants, and they failed to make any effort to remedy these breaches despite having knowledge of them.

196.     Therefore, as a direct and proximate result of the breaches of fiduciary duty by the Monitoring Defendants during the Class Period alleged herein, the Plan and, indirectly, the Plan Participants, lost substantial retirement savings.

197.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT IV
## FAILURE TO PRUDENTLY AND LOYALLY MANAGE THE PLAN'S ASSETS
## (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404 AND 405 BY STATE STREET)

198.     Plaintiffs incorporate each and every preceding allegation as though fully set forth herein.

199.     At all relevant times, as alleged above, Defendant State Street was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

200.     Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that all investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. State Street could not blindly follow directions of the Prudence Defendants and the Monitoring Defendants if it knew or should have known such directions were improper under ERISA.

201.     A directed trustee's duty of prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a

fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants, nor may it allow others, including those whom they direct, or who are directed by the plan, including plan trustees, to do so.

202.     State Street breached its duties to prudently and loyally manage the Plan's assets. During the Class Period, based on the red flags raised in the public domain through Company reports and the negative commentaries concerning the Company in the financial press, State Street knew or should have known that, as described herein, Company Stock was not a prudent investment for the Plan.  Yet, during the Class Period, despite its knowledge of the imprudence of the investment, State Street failed to take any meaningful steps to protect Plan Participants from the losses stemming from the Plan's investment in SunEdison Stock that it knew would ensue, as the already-weakened and overleveraged SunEdison reported quarter after quarter of losses as its business model became increasingly difficult and its ultimate demise became significantly more likely.

203.     State Street further breached its duties of loyalty and prudence by failing to divest the Plan of Company Stock or prevent the Plan from purchasing additional Company Stock, when it knew or should have known that this stock was not a suitable and appropriate investment for the Plan.

204.     State Street also breached its co-fiduciary obligations by, among their other failures, knowingly participating in the other fiduciaries' failures to protect the Plan from inevitable losses. State Street had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy them.

205.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plan Participants, lost a significant portion of their retirement investment.  Had State Street taken appropriate steps to comply with its fiduciary obligations, the

Plan could have liquidated some or all of its holdings in Company Stock, and/or avoided additional purchases of Company Stock, and thereby eliminated, or at least reduced, its losses .

206.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendant in this Count is liable to restore the losses to the Plan caused by its breaches of fiduciary duties alleged in this Count.

## CAUSATION

207.     The losses to the Plan's assets invested in SunEdison Stock during the Class Period could have and would have been avoided in whole or in part by Defendants complying with their ERISA-mandated fiduciary duties.

208.     Defendants — who knew or should have known that SunEdison Stock was an imprudent retirement investment — chose to, as fiduciaries, continue allowing the Plan to maintain and acquire further SunEdison Stock, while taking no action to protect their wards as SunEdison's condition worsened and the Plan Participants' retirement savings were decimated. Prudent fiduciaries would have acted otherwise and taken appropriate actions to protect the Plan and its participants.

209.     To the extent Defendants were required to take action based on non-publicly disclosed information that they were privy to, the following alternative options — which are pled as alternative statements under FED. R. CIV. P. 8(d)(2) to the extent they are inconsistent — were available to Defendants and (a) could have been done without violating securities laws or any other laws, (b) should have been done to fulfill Defendants' fiduciary obligations under ERISA, and (c) would not have been more likely to harm the Plan than to help it.

210.     As discussed above, Defendants had numerous options to protect the Plan and its Participants but failed to do so.

211.     As a result of Defendants' breaches, the Plan suffered heavy losses during the Class

Period because substantial assets of the Plan were imprudently invested, or allowed to be invested, by Defendants in Company Stock during the Class Period, in breach of Defendants' fiduciary duties, as reflected in the diminished account balances of the Plan Participants.

## REMEDIES FOR BREACHES OF FIDUCIARY DUTY

212.    As noted above, as a consequence of Defendants' breaches, the Plan suffered significant losses.

213.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary … who breaches any of the … duties imposed upon fiduciaries … to make good to such plan any losses to the plan…."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

214.    Plaintiff, the Plan, and the Class are therefore entitled to relief from Defendants in the form of:  (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (c) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d) taxable costs; (e) interests on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

215.    Each Defendant is jointly and severally liable for the acts of the other Defendants as a co-fiduciary.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

A.    A Judgment that the Defendants, and each of them, breached their ERISA fiduciary duties to the Plan Participants during the Class Period;

B.    A Judgment compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.    A Judgment imposing a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.    A Judgment awarding actual damages in the amount of any losses the Plan suffered, to be allocated among the Plan Participants' individual accounts in proportion to the accounts' losses;

E.    A Judgment requiring that Defendants allocate the Plan's recoveries to the accounts of all Plan Participants who had any portion of their account balances invested in SunEdison Stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price of SunEdison Stock;

F.    A Judgment awarding costs pursuant to 29 U.S.C. § 1132(g);

G.    A Judgment awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.    A Judgment awarding equitable restitution and other appropriate equitable monetary relief against the Defendants.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury as to all claims so triable.

Dated: February 9, 2016

Respectfully submitted,

THE HEIN LAW FIRM, L.C.
Richard B. Hein

s/ Richard B. Hein
Richard B. Hein (E.D. Mo. No. 45437MO)

7750 Clayton Road, Suite 102
St. Louis, Missouri 63117
Telephone:     (314) 645-7900
Facsimile:      (314) 645-7901

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.
Albert Y. Chang
Yury A. Kolesnikov
7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037
Telephone:     (858) 914-2001
Facsimile:      (858) 914-2002

*Attorneys for Plaintiffs*